UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RHONDA SMITH<br>3116 O Street, S.E.<br>Washington, DC 20020, | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Case No.<br>) |
| ERIC HOLDER,<br>as and his capacity as Attorney General<br>Department of Justice<br>810 7th Street, N.W., Room 3424<br>Washington, D.C.  20531, | )<br>)<br>)<br>)<br>)<br>) |
| Defendant. | )<br>)<br>) JURY TRIAL DEMANDED |

**VERIFIED COMPLAINT**
(Race & Disability Discrimination, Reprisal)

**A.  PRELIMINARY STATEMENT**

1.      The Court has jurisdiction of this case under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-5(f) and 2000e-16(c); the Rehabilitation Act, 29 U.S.C. § 791; and 28 U.S.C. §§ 1331, 1343.

2.      Venue properly lies within this District under Title VII, 42 U.S.C. § 2000e-5(f), because plaintiff's claims arose within this judicial district.

**B.  THE PARTIES**

3.      Plaintiff Rhonda Smith (hereinafter "plaintiff") is a resident of Washington, DC, and is currently an employee of the Office of Justice Programs, Department of Justice (hereinafter "the Agency").

4.      Plaintiff sues Defendant Eric Holder in his official capacity as Attorney General.

5.     The Department of Justice (DOJ) is a government agency, which employs over 50,000 employees across the United States, including the District of Columbia.  At all times relevant to this action, the DOJ has been an Executive Agency as defined by 5 U.S.C. § 102 and covered by Title VII, 42 U.S.C. § 2000e-16(a).

## C. FACTS CENTRAL TO PLAINTIFF'S CLAIMS

6.     Plaintiff is an African-American female.

7.     Plaintiff has worked for the DOJ for 15 years, of which 12 have been in Office of Justice Programs ("OJP") as a Staff Accountant.

8.     In 1995, plaintiff began her employment with the Agency as a GS-5 Staff Accountant with the Office of Community Oriented Policing Services.

9.     In March 1998, plaintiff began working as a GS-9 with OJP under the Monitoring Division as a Staff Accountant.

11.    Beginning with her employment with OJP, plaintiff has had a history of asthma.

10.    In March 2005, plaintiff filed an EEO complaint due to her reassignment from the Monitoring Branch to the Audit Resolution Branch while she was on extended medical leave for knee surgery in March 2005.  Since the Agency returned her to her original position, performing her original duties, the Agency dismissed her EEO complaint.

12.    In or about May 2005, the Monitoring Division/External Oversight Division, where plaintiff worked, moved back into the main DOJ building at 810 7th Street, N.W.

13.    In late December 2005, plaintiff begun to experience asthma attacks more frequently and severely because the overhead air vents/slotted diffusers forcefully blew cold air directly on her in her workspace.

3

14.     Before the move, plaintiff had not experienced asthma attacks at her prior work location as frequently or as severely.

15.     During this time, as plaintiff's asthma condition worsened, she contacted various management officials to complain about the cold blowing air and to ask for an accommodation to a workspace free from cold blowing air.

16.     From December 2005 to the present, the Agency has made poor attempts to accommodate plaintiff's asthma.  For example, it moved vents two or three tiles over and it partially or completely closed the vents in her workspace.  On occasion, the Agency completely closed the vents in plaintiff's workspace, or it moved her workplace to different areas.

17.     However, the Agency never effectively accommodated plaintiff's requirements to work in a space free from cold, blowing air.  No matter where the Agency placed her, plaintiff always felt some cold air blowing on her.

18.     On January 4, 2006, Dr. Karen Bledsoe, plaintiff's primary care physician, recommended that the Agency arrange for an occupational physician to evaluate her workspace to confirm whether the excessive airflow aggravated her asthma.

19.     Beginning on or about January 5, 2006, plaintiff made several inquiries to OJP officials, requesting the name of the Agency's occupational physician.

20.     However, the Agency did not respond to plaintiff's requests until February 13, 2006, when it replied that it did not have an occupational physician.

21.     In July 2006, the Agency detailed plaintiff to the Customer Service Branch (CSB), Financial Accounting Division, Office of the Chief Financial Officer, Office of Justice Programs ("OCFO") as a Staff Accountant and moved her to the fifth floor of the building.

22.     At most relevant times Darlene Mongelli (white) was the Branch Manager of CSB and plaintiff's first-line supervisor.  Joanne Suttington (white), the Assistant Chief Financial Officer, has been plaintiff's second and acting first line supervisor.

23.     Although the Agency relocated plaintiff to a different office, she still experienced cold air blowing on her, even more than what she encountered in her previous workspace.

24.     Plaintiff complained to Ms. Mongelli and Ms. Marshall about the Agency's failure to accommodate her.

25.     As with plaintiff's prior complaints, the Agency handled them by turning vents down and/or moving vents.  However, the Agency never completely shut of the vents, and the cold air continued to blow on her, aggravating her asthma.

26.     Angela Hill, the Special Assistant to the CFO, mentioned to plaintiff that she had several discussions with Ms. Mongelli about moving plaintiff to a different office.

27.     However, the Agency never did so.

28.     Beginning about July 2006 and continuing until about December 2009, Ms. Mongelli continuously subjected plaintiff to a hostile work environment because of her disability and race and retaliated against her for requesting accommodations and for engaging in other protected activities.

29.     Prior to plaintiff's detail to CSB, she had shoulder and multiple knee surgeries, which required a significant amount of leave for recovery.  Plaintiff also used leave in connection to asthma attacks.

30.     In or about August 2006, Ms. Mongelli issued plaintiff a Memorandum of Counseling for Possible Leave Restrictions, without discussing her prior leave use (which her former supervisors approved without any concerns).

31.     Thus, Ms. Mongelli unfairly disciplined plaintiff based on her documented disability.  This was the first incident, which contributed to a hostile work environment for plaintiff.

32.     By contrast, at about this same time, Ms. Mongelli sat down with Marcus Doakes to obtain an explanation for his low and/or negative leave balances.  Upon information and belief, Mr. Doakes does not have a documented disability and has never asked for an accommodation.

33.     In December 2006, Dr. Leslie Kingslow, a pulmonary specialist, concluded that plaintiff should attempt to have her office space moved to avoid cold air.

34.     Dr. Kingslow based his conclusions on peak flow readings, which showed that plaintiff's breathing deteriorated significantly when exposed to cold air blowing directly on her.

35.     Nevertheless, to date, the Agency has continued to mishandle plaintiff's requests for an accommodation for her asthma disability.

36.     In January 2007, the Agency reassigned plaintiff to her current position as Staff Accountant in the OCFO's Customer Service Branch.

37.     As a Staff Accountant, plaintiff works on closeout grants, which involve a lot of typing.  She also prepared letters to grantees and performed numerous accounting duties requiring keyboarding duties.

38.     In early March 2007, plaintiff began experiencing problems with her right hand and wrist.  Her right hand became swollen and discolored, causing her pain and discomfort.  In addition, her fingertips were numb and tingled.

39.     Ms. Mongelli could see that the condition of plaintiff's right hand was swollen.

6

40.    At the time, plaintiff's daily work activities involved working on paper files approximately sixty to seventy percent of the time.  This involved flipping through files with her hands, lifting files from one place to another, and entering data into a word processor and various DOJ software programs approximately thirty percent of the time.

41.    On March 1, 2007, Ms. Mongelli asked plaintiff if she had a medical note from the pulmonary specialist so that she could put in plaintiff's request to move to an office that had very little ventilation.

42.    This was an office that was actually built for Ms. Mongelli, but she stated that she preferred to sit in a cubicle since the ventilation was poor, the office was small, and she was claustrophobic.

43.    Two contractors were currently occupying the office, but Ms. Mongelli stated that they could be moved to plaintiff's cubicle and she could be moved to the office if she had medical documentation to support her request for accommodation.

44.    Plaintiff informed Ms. Mongelli that Erica Smith, her union representative, had given the medical documentation to Jamie Payne in Human Resources.

45.    Ms. Mongelli questioned why plaintiff did not give it to her.  Plaintiff responded that in a meeting with Ms. Payne and Stuart Smith, union president, Ms. Payne had advised plaintiff to forward such medical documentation to HR through the union.

46.    On or about March 12, 2007, Dr. Bledsoe examined plaintiff's swollen right hand and wrist, sent her for X-rays, and referred her to Dr. David Dorin, an orthopedist.

47.    On or about March 23, 2007, Dr. Dorin diagnosed plaintiff with severe tendonitis. Because of its severity, Dr. Dorin determined that Plaintiff engaging in certain major life

activities, such as keyboarding, writing, and lifting would worsen the conditions of her right hand and wrist

48. As part of her treatment, Dr. Dorin placed plaintiff's hand and wrist in a splint. In addition, he ordered her to stay off work from March 23, 2007, to March 30, 2007.

49. Dr. Dorin also instructed Ms. Smith to do as little as possible to rest her hand and wrist and to report to him on March 30, 2007, to assess her progress.

50. On March 23, 2007, Plaintiff submitted a request for 40 hours of advance sick leave to Ms. Mongelli, along with a certificate from Dr. Dorin, which restricted her work (no keyboarding, writing, or lifting with right hand).

51. Plaintiff had previously used up her sick leave reserve due to three prior back-to-back surgeries, asthma attacks, and other medical illnesses such as viral infections.

52. On or about March 28, 2007, Ms. Mongelli denied plaintiff's request for advance sick leave, maintaining that the medical note she submitted did not specify her condition or contain her doctor's original signature, only a rubber stamped copy.

53. Nevertheless, while Dr. Dorin's note did not specify plaintiff's condition, Ms. Mongelli already knew, first-hand, that plaintiff was having problems with her hand and wrist.

54. Thus, in March 2007, plaintiff told her that she had pain in her hand, that her hand was swollen, and that she had tingling in her fingers.

55. Additionally, Ms. Mongelli admittedly had no doubts about the authenticity of plaintiff's medical note.

56. Also, Ms. Mongelli herself used rubber stamps for her own signature.

57.     Further, Ms Mongelli asserted that plaintiff could perform other job tasks which that did not involve the doctor's restrictions and which did not involve the use of a keyboard, such as reviewing co-workers' closeouts.

58.     Ms. Mongelli was motivated to deny plaintiff's request for advanced sick leave because of her race.

59.     Also on March 28, Ms. Mongelli telephoned plaintiff at home and ordered her to come back to work immediately.

60.     In response to Ms. Mongelli's order to return to work immediately, plaintiff told her that she would not disobey her doctor's orders and further injure herself and would not report to work.

61.     Plaintiff needed to follow her doctor's orders to avoid further injury and informed Ms. Mongelli that the medical certification was the original and that her doctor had used a stamp, rather than a pen.

62.     Ms. Mongelli stated that until plaintiff returned to work, she would be AWOL.

63.     Thereupon, plaintiff contacted her union representative, Erica Smith, and told her about her phone call with Ms. Mongelli and her threat of declaring plaintiff as AWOL.

64.     Subsequently, Erica Smith contacted Phillip Merkle, Director of Administration for OJP, to complain about Ms. Mongelli's actions towards plaintiff.

65.     Mr. Merkle advised Ms. Mongelli that she did not have to approve plaintiff for advanced sick leave and could treat her absence as leave without pay (LWOP), but not AWOL.

66.     Due to Mr. Merkle's conversation with Ms. Smith, Ms. Mongelli did not go forward with the AWOL charges against plaintiff.

67.     However, she did not approve plaintiff's request for advance sick leave.

9

68.    Plaintiff took leave without pay (LWOP) from March 23 to March 30, 2007, using approximately 44 hours of leave.

69.    On March 30, 2007, plaintiff had a follow-up appointment with Dr. Dorin.  The symptoms in her right hand and wrist were still present and painful.  Dr. Dorin replaced plaintiff's wrist splint with a hard cast to provide more stability to her hand and wrist.

70.    In addition, Dr. Dorin gave plaintiff a note stating that, due to tendonitis, she was totally incapacitated from engaging in any major life activities involving her right hand.

71.    Dr. Dorin also ordered Ms. Smith to remain out of work until April 13, 2007.

72.    On the same day, plaintiff went to the office to speak with Ms. Mongelli about the new medical orders.  However, she was not available.

73.    On the morning of April 2, 2007, plaintiff called Ms. Mongelli to inform her of Dr. Dorin's new medical orders and told her that she attempted to reach her the previous Friday when she was unavailable.

74.    In an angry tone, Ms. Mongelli responded that if she was not at her desk when plaintiff arrived at the office, to find her because she needed to speak to her about the use of her leave.

75.    Based on the tone and manner in which Ms. Mongelli spoke, plaintiff reasonably felt the need to have a union representative attend the meeting in case Ms. Mongelli took disciplinary action against her.  Thus, plaintiff contacted Ms. Smith, who agreed to accompany her to the meeting with Ms. Mongelli.

76.    During this meeting Ms. Mongelli again stated, as she did on March 28, that plaintiff should immediately report to work.

77.    Plaintiff began to reply that this was against her doctor's orders and started to say, "Since you are ordering me to violate my doctor's orders . . . ."

78.    However, Ms. Mongelli interrupted plaintiff and quickly stated that she was not ordering her to do anything.

79.    Plaintiff rephrased her point and said, "Since you are telling me to report to work, I would like to have this in writing."

80.    Ms. Mongelli stated that due to plaintiff's leave situation, she did not feel that plaintiff could afford to stay home without pay.  She also said that plaintiff could perform plenty of tasks that did not require plaintiff to use her hands.

81.    Plaintiff requested that Ms. Mongelli put her requests in writing and make it available for plaintiff when she reported to work the next day, April 3.

82.    Ms. Mongelli agreed to this request.

83.    On April 3, 2007, upon plaintiff's return to work, Ms. Mongelli did not create the list of tasks for her to perform, as she had promised at their prior meeting.

84.    When plaintiff sought out Ms. Mongelli on April 3, 2007, she was unavailable.

85.    This was another example of how the Agency failed to accommodate plaintiff's disability and perpetuated a hostile work environment for her, based on her disability.

86.    Also on April 3, 2007, plaintiff asked the Agency's nurse to examine her workspace and to make necessary adjustments so that she could work more comfortably in light of her hand/wrist condition.

87.    However, the nurse stated that she could not come to her workstation absent approval from the Human Resources Office.

88.     The nurse requested a copy of the medical note from Dr. Dorin and, after plaintiff gave it to her, placed it in plaintiff's file.

89.     Plaintiff then went to the Human Resources Office for clarification of a statement about the Voluntary Leave Bank (VLB) form, which stated the supervisors had the right to deny VLB leave, just as they could deny annual leave.

90.     In the Human Resources Office, Katherine King, a benefits specialist, and her supervisor, Gaye Walker, asked plaintiff why she was at work when she had a medical note stating that she was unable to work.

91.     Plaintiff explained that she was at work because Ms. Mongelli had ordered her to return to work.

92.     Then Veronica Hudson in Labor Relations determined that it was a liability for plaintiff to remain at work and that Ms. Mongelli was wrong to make her return to work.

93.     Ms. Hudson instructed plaintiff to complete leave bank paperwork and give it to Ms. Mongelli with the doctor's note for her to approve.

94.     Ms. Hudson asked Ms. King to make a copy of all of plaintiff's paperwork and stated that she would contact her supervisor directly to advise her that she should not have instructed plaintiff to report to work against medical orders.

95.     Ms. Hudson also advised plaintiff that she should obtain a written statement from Ms. Mongelli that she was requiring her to report to work to perform duties outside her restrictions; plaintiff's doctor would then need to approve this statement before she could return to work.

96.     When plaintiff requested this document from Ms. Mongelli, however, she denied that she had agreed to provide such a statement, and she never provided one.

97.    Also on April 3, 2007, HR officials informed OCFO management that plaintiff must go home until her doctor released her to return to work.

98.    Further, the personnel officials also told OCFO management that they must sign the leave bank form and return it to plaintiff so that she could apply for leave through the leave bank, since she was not receiving advance sick leave.

99.    Subsequently, on April 3, plaintiff submitted to Ms. Mongelli a request for 80 hours of advance sick leave.

100.   On April 6, 2007, Ms. Mongelli denied plaintiff's request for 80 hours of advance sick leave because of her low annual leave balance (.25 hours) and negative sick leave balance (-102.75).

101.   Up until this point, the Agency had not advanced plaintiff any leave and she had received no income since about March 23, 2007.

102.   On April 13, 2007, Dr. Dorin cleared plaintiff to return to work on April 17, 2007. Although all of her tendonitis symptoms were still present, Dr. Dorin allowed her to work on light duty status, with a five-pound lifting restriction.

103.   On April 17, plaintiff returned to the office.

104.   On that date Ms. Mongelli informed her that she removed her as a team leader on Max Mirin's (African-American) closeouts.

105.   During plaintiff's absences in March and April, Wendy Lynch (Asian) was the designated person to review Mr. Mirin's closeouts.

106.   Therefore, Ms. Mongelli should have held Ms. Lynch responsible for reviewing Mr. Mirin's closeouts.

107.    Additionally, Mr. Mirin asked Ms. Mongelli if he was to resume giving his closeouts to plaintiff, but she never responded to him.  Therefore, Ms. Lynch should have still been reviewing Mr. Mirin's closeouts after plaintiff returned to work on April 17 and until June 25, 2007.

108.    Furthermore, during March and April 2007, Ms. Mongelli failed to discuss with plaintiff the extent to which she could perform her duties without violating her doctor's restrictions.

109.    Thus, the Agency failed to engage in the "interactive process" with plaintiff about accommodating her disabilities.

110.    Repeatedly during March-April 2007, as well as at other times, the Agency failed to engage in that "interactive process."

111.    On or about April 25, 2007, plaintiff began her most recent EEO activities by asking Ms. Stacie Brockmann, former OJP EEO Director, about the criteria for filing an EEO complaint.

112.    In May 2007, plaintiff began physical therapy for her tendonitis.  The physical therapists observed that plaintiff's symptoms were not symptomatic of tendonitis, but rather of carpal tunnel syndrome.  They recommended that that she obtain a second opinion of the tendonitis diagnosis.

113.    On or about May 4, 2007, Dr. Dorin examined plaintiff and wrote her a medical note prohibiting her from any keyboarding between May 4 and May 8, 2007.

114.    Later on the same day, plaintiff provided Ms. Mongelli with Dr. Dorin's medical note.

115.    Ms. Mongelli stated to plaintiff that Ms. Tamara Ross, a fellow co-worker, would do Ms. Smith's keyboarding.

116.    On or about May 14, 2007, while at work, plaintiff experienced an asthma attack due to cold air exposure, and the D.C. Paramedics had to respond.

117.    The paramedics provided plaintiff with breathing treatments on site at the nurse's station and opened her airways to reduce her wheezing and shortness of breath. Afterwards, plaintiff took the rest of the day off.

118.    The next day, plaintiff went to see Dr. Kingslow, who examined her and cleared her to return to work.

119.    On or about May 16, 2007, as plaintiff was preparing for work, she again experienced difficulty breathing and had to go back to Dr. Kingslow's office for an emergency appointment. After administering treatment for plaintiff's asthma attack, Dr. Kingslow instructed her to take off work for the remainder of the week.

120.    Subsequently plaintiff took LWOP for the period of May 14 through May 18, 2007.

121.    On or about May 23, 2007, plaintiff returned to work and submitted a request for advanced leave for May 14–18, 2007 (44 hours).

122.    However, Ms. Mongelli denied her request, just as she had done with plaintiff's prior advanced leave requests.

123.    On or about June 14, 2007, plaintiff filed a claim with the Department of Labor, Office of Workers' Compensation Programs (OWCP) for plaintiff's asthma condition.

124.    OWCP later accepted that claim.

125.    Ms. Mongelli continued to create a hostile work environment for plaintiff by treating her differently from other employees, based on her race and disabilities.

126.    On or about June 25, 2007, Ms. Mongelli sent plaintiff a threatening e-mail, criticizing her for not reviewing Mr. Mirin's closeouts.

127.    However, Mr. Mirin had completed many of the closeouts while plaintiff was on medical leave between March 23 and April 16, 2007, and Ms. Lynch was in charge of reviewing his paper closeouts.  So Ms. Mongelli should have held Ms. Lynch responsible for reviewing Mr. Mirin's closeouts.

128.    Further, Ms. Mongelli never told plaintiff that, although she removed her team leader title, she retained her team leader duties.

129.    At around this time, Ms. Mongelli also held plaintiff responsible for completion of the "1st Quarter Excess Cash Project," even though plaintiff was removed from that task.

130.    Plaintiff did not volunteer for this project because it involved a significant amount of keyboard work; she actually volunteered only to develop some standard comments that fellow staff could use in future excess cash projects.

131.    Throughout June 2007, plaintiff received e-mails from Ms. Mongelli reminding her that she allegedly volunteered for the "1st Quarter Excess Cash Project" and her responsibility for completing this project.

132.    Plaintiff responded to Ms. Mongelli's e-mails, stating that she did not volunteer to complete the project because her medical restrictions prohibited her from keyboarding.

133.    On or about June 28, 2007, with Ms. Hudson present, Mr. Merkle provided plaintiff with the Agency's reasonable accommodation form and stated that the form was only for medical conditions that are long-term or permanent.  (Frank Ramos, Associate Chief

Financial Officer, and Ms. Suttington previously had questions regarding the medical restrictions/notes that plaintiff's doctor issued. They both stated that the medical notes did not sufficiently document why restrictions were necessary or the length of time needed for the restrictions.)

134.   Plaintiff advised Mr. Merkle that she had an appointment the next day with another orthopedic specialist and based on their diagnoses (if they said the condition was long-term or permanent), she would complete the reasonable accommodation form.

135.   However, plaintiff's carpal tunnel syndrome was and is a long-term medical condition.

136.   On or about June 29, 2007, Dr. Uchenua Nwaneri, an orthopedist, diagnosed plaintiff with carpal tunnel syndrome. He also recommended that she see a neurologist and obtain a confirmation diagnosis from a hand specialist.

137.   On the same day, Dr. Nwaneri restricted plaintiff against using the keyboard for 30 days. The purpose of the restriction was to allow further examination to determine whether plaintiff suffered from carpal tunnel syndrome.

138.   On July 3, 2007, plaintiff provided Ms. Suttington and Mr. Ramos with a copy of Dr. Nwaneri's June 29 medical note, which restricted her keyboarding for 30 days.

139.   By July 3, 2007, the Agency finally realized that plaintiff needed accommodations for her hand and wrist disability.

140.   Thus, on this date, plaintiff received a memorandum from Mr. Merkle, stating that the Agency had recently learned that she had a medical condition that potentially required reasonable accommodations. Mr. Merkle's memo required plaintiff to provide sufficient details

of my medical conditions, how it affected her ability to do her job, and what accommodations she needs.

141.   Also on that date, plaintiff provided Ms. Suttington and Mr. Ramos with a copy of Dr. Nwaneri's June 29, 2007, medical note, which contained the 30-day keyboard restriction and answered her managers' inquiries.

142.   Upon receiving the letter, Mr. Ramos told plaintiff that the Agency would honor her medical restriction.  He also sent an e-mail that same day confirming his promise to plaintiff.

143.   In his e-mail to plaintiff, Mr. Ramos asked her whether she had any current projects that required the use of a keyboard.  If so, she should let either him, Ms. Mongelli, or Ms. Suttington know.

144.   In response to Mr. Ramos's email, plaintiff stated:

> The only project that I had prior to the June 29, 2007 restriction was the 1st quarter excess cash project compilation /reconciliation of report/work that staff started.  I believe this has already been reassigned (or should have already been reassigned).  I am not aware of any new assignment as I am not logging into the system/using the keyboard.

145.   However, despite the Agency's awareness of plaintiff's disability, it continued to show no sympathy for her disabilities and did not provide her with reasonable accommodations.

146.   By contrast, between mid-June until about July 18, 2007, when Ms. Mongelli was out on extended medical leave, the Agency permitted her to work half days for a portion of the time she was at home.

147.   On or about July 20, 2007, Ms. Mongelli sent plaintiff home on LWOP until her doctor cleared her to perform all of her duties fully.

148.   Additionally, on that same day, Ms. Mongelli issued plaintiff a memorandum stating that since plaintiff could not keyboard, the Agency would not permit her to report to work for the five remaining work days under the imposed 30-day no keyboard order.

149.   Mongelli's memo incorrectly stated the extent of plaintiff's work responsibilities and made allegations about her that were untrue.

150.   Ms. Mongelli's decision to send plaintiff home did not make sense because there was enough non-keyboarding work available for her to complete and assigning it to her would reasonably have accommodated her.

151.   For example, Ms. Mongelli assigned plaintiff to review Mr. Mirin's large volume of closeouts, which occupied a majority of plaintiff's time.

152.   Indeed, Ms. Mongelli had considered the non-keyboarding task of reviewing the closeouts completed by Mr. Mirin, to be an essential part of her job.

153.   Further, plaintiff's performance on Mr. Mirin's closeouts was exceptional to the point that Ms. Mongelli requested to convert her detail in the Customer Service Branch into a permanent position.

154.   Therefore, as a reasonable accommodation for her disability, the Agency should have let plaintiff continue to work intermittently.

155.   Ms. Mongelli's failure to accommodate Ms. Smith further created a hostile work environment for her.  Ms. Mongelli's decision that plaintiff could not remain at work for the five remaining days not only showed her hostility towards her disability, but also created yet another financial hardship for plaintiff because she received no pay for those five days.

156.   Moreover, Ms. Mongelli consistently made plaintiff's work experience at the office unbearable by not respecting her documented disabilities and by targeting her, while

treating other employees more formally. Thus, Ms. Mongelli's discrimination against plaintiff was severe and pervasive.

157. On or about July 25, 2007, plaintiff initiated her informal EEO complaint by contacting Ms. Brockmann, claiming that Ms. Mongelli created a hostile work environment for her, failed to accommodate her disabilities, and discriminated against her based on race.

158. On or about this same day, plaintiff learned that Mr. Merkle's statements to her about disability accommodation on June 28, 2007 were untrue.

159. At all relevant times, the Agency has a documented reasonable accommodation policy by which it can reassign disabled employees into non-vacant positions.

160. Upon information and belief, in the past the Agency has provided reasonable accommodations to disabled employees by reassigning them to non-vacant positions.

161. On July 26, 2007, plaintiff informed Tonya Yarborough from the Agency's EEO office about Ms. Mongelli's discriminatory treatment of her and its resulting hostile work environment.

162. On or about July 30, 2007, plaintiff consulted Dr. Ricardo Pyfrom, a hand specialist, who confirmed the diagnosis of occupational carpal tunnel syndrome.

163. Upon confirmation of her diagnosis, she submitted the required paperwork to OWCP for occupational illness.

164. After plaintiff filed her EEO complaint against Ms. Mongelli, Ms. Mongelli's hostile treatment of plaintiff continued.

165. For instance, on numerous occasions plaintiff requested that Ms. Mongelli provide her with written instructions for completing the Excess Cash Project for the first quarter of FY2007.

166.    However, Ms. Mongelli would not respond to any of plaintiff's e-mails.

167.    On or about August 1, 2007, plaintiff submitted her request for reasonable accommodations to Mr. Merkle for her carpal tunnel syndrome.

168.    This was a follow-up request, this time to Mr. Merkle.  Specifically plaintiff requested what Dr. Pyfrom advised: that she work with a brace and "keyboard 4 hours/day with breaks every hour of typing for 5 minutes."

169.    On or about August 2, 2007, Ms. Mongelli informed plaintiff that she was responsible for making phone calls to resolve excess cash items left incomplete or unresolved by other team members working on the Excess Cash Project.

170.    Plaintiff requested that Ms. Mongelli provide her with written instructions of what she was responsible for as it related to the completion of the Excess Cash Project.

171.    However, Ms. Mongelli rudely objected to providing any written instructions.

172.    Moreover, on or about August 2, Ms. Mongelli alleged that plaintiff had stated that she could not make phone calls due to her medical restrictions.

173.    On the contrary, neither plaintiff nor her doctors ever declared she was unable to make phone calls because of her carpal tunnel syndrome.

174.    In addition, Ms. Mongelli's most recent e-mails never mentioned following up on fellow co-workers' unresolved reviews.

175.    During August 2007, Ms. Mongelli continued to treat plaintiff differently from other employees based on her disabilities and race.  Examples follow:

176.    In August 2007, Ms. Lynch, who was the Excess Cash Project team leader, went on leave, for medical reasons.

177.    When she returned from leave, Ms. Mongelli did not strip Ms. Lynch of team leader status; nor did she hold her responsible for finalizing the Excess Cash Project for the quarters she was assigned.

178.    Additionally, Ms. Mongelli gave other co-workers a grace period of at least 15 minutes if they arrived at work late.

179.    However, if plaintiff arrived at work late within the first 15 minutes, Ms. Mongelli required her to submit a leave slip.

180.    Furthermore, the Agency permitted employees such as Ms. Mongelli to work from home during inclement weather and medical absences to avoid using annual and/or sick leave.

181.    By contrast, the Agency required plaintiff to use her leave or take LWOP for medical absences and during inclement weather days when the unscheduled leave policy was in effect.

182.    On or about August 7, 2007, plaintiff sent an e-mail to Ms. Smith and Stuart Smith (her union representatives), requesting their assistance on how to handle her situation with Ms. Mongelli and about her conversations with the Agency's EEO office regarding her complaint.

183.    On the same day, Mr. Smith forwarded Plaintiff's e-mail to Ms. Mongelli and stated, "Darlene please respond to Rhonda."

184.    This informed Ms. Mongelli that plaintiff was pursuing an EEO complaint against her.

185.    In any event, Ms. Mongelli knew of plaintiff's EEO complaint by August 14, 2007.

186.   Thereafter, plaintiff experienced reprisal from Ms. Mongelli not only for requesting accommodations, but also for processing her EEO complaint.

187.   On or about August 14, 2007, plaintiff received an e-mail from Ms. Mongelli containing incorrect information regarding her leave slips for August 8 and 9, 2007.

188.   As plaintiff began to respond to Ms. Mongelli's e-mail, Ms. Mongelli walked into her workstation.

189.   Immediately upon entering plaintiff's workspace, Ms. Mongelli leaned over plaintiff's shoulder, read the draft of plaintiff's e-mail response, and angrily said, "More E-mails."

190.   Plaintiff turned around to Ms. Mongelli and asked that she not walk into her work station and stand over her to read her e-mails; she asked Ms. Mongelli to please announce herself or knock.

191.   Ms. Mongelli stated that she did not have to do that with anyone else and that she did not feel that she should have to do it with plaintiff.

192.   Plaintiff again asked Ms. Mongelli not to intrude into her workspace unannounced. She said this showed a lack of respect and privacy toward her and that she would appreciate it if Ms. Mongelli would announce herself in the future.

193.   However, Ms. Mongelli again objected to plaintiff's request.

194.   Plaintiff then stood up and told Ms. Mongelli that she was going to report her actions to the EEO office.

195.   Ms. Mongelli took a couple of steps back, then plaintiff said, "Excuse me," to Ms. Mongelli because she was blocking her exit out of her cubicle.

196.   However, Ms. Mongelli did not move.

197.   Plaintiff then began stepping over the guest chair in her workstation to avoid contact with Ms. Mongelli.

198.   However, Ms. Mongelli moved her body into plaintiff and deliberately blocked plaintiff's departure, and she pushed her.

199.   Ms. Mongelli pushed plaintiff hard enough that she had to grab onto the cubicle wall to keep from falling.

200.   Once plaintiff regained her balance, she immediately went to the Agency's EEO office and advised Ms. Yarborough about what Ms. Mongelli had just done.

201.   Ms. Mongelli assaulted plaintiff because she was attempting to file another EEO complaint against her.

202.   Ms. Mongelli thus retaliated against plaintiff because of her prior EEO activities.

203.   Plaintiff filed her formal EEO complaint on October 26, 2007.

204.   In early January 2008, OWCP accepted plaintiff's workers compensation claim for carpal tunnel syndrome.

205.   On or about January 30, 2008, plaintiff had carpal tunnel release surgery.  She took approximately six months of leave to recover from her surgery.

206.   In March 2008, due to the large amount of LWOP which the Agency had forced plaintiff to take, she experienced a delay of her within-grade salary increase, which is still not rectified.

207.   On or about July 14, 2008, plaintiff returned to work with the following work restrictions from her surgeon:  keyboarding tasks not to exceed 30 minutes cumulatively per hour, four-hour workdays, and typing on an ergonomic keyboard with voice activated software.

208.   The Agency implemented some of plaintiff's work restrictions, but, it did not satisfy fully all of her work restrictions.

209.   For example, the Agency did not provide plaintiff with voice activated software until November 4, 2008, and the software is not compatible with the accounting system software used in her department.

210.   After a year and a half of interaction with the Agency's Information Technology Department, plaintiff still does not have the accommodation of compatible voice activated software.

211.   Since plaintiff's reassignment to the CSB, union officials have attempted to have her returned to her original position.

212.   Ms. Smith had a discussion with Mr. Merkle, in which he offered to reassign plaintiff back to GFMD, but not to her original branch, which conducted in-house reviews and performed site visits.

213.   Plaintiff turned Mr. Merkle's offer down because FSB, the branch at GFMD that he offered, performed more keyboarding than her current position, which went against her work restrictions.

214.   During the relevant period, the Agency had vacant positions to which it could transfer plaintiff as reasonable accommodation for her.

215.   For example, since plaintiff has asked for it a reassignment, the Agency has had vacant positions in the External Oversight Branch and Evaluation and Oversight Branch, Grants Financial Management Division.

216.   However, it refused or failed to transfer plaintiff.

217.   On various occasion between 2009 and the present, plaintiff has asked the Agency to transfer her to a different branch as a reasonable accommodate, but the Agency has not transferred her.

218.   On numerous occasions throughout the rest of 2008, plaintiff complained that she experienced cold air blowing on her in her workstation, which intensified her asthma condition.

219.   However, the Agency took no actions to address fully plaintiff's concerns.

220.   Subsequently, on or about December 15, 2008, plaintiff suffered another asthma attack due to the cold air exposure.

221.   On or about December 31, 2008, Dr. Pyfrom diagnosed plaintiff with bilateral carpal tunnel syndrome.

222.   On or about December 22, 2008, plaintiff filed a claim for compensation with OWCP for the asthma attack she had in December 2008.

223.   However, the Agency denied that the asthma attack occurred as a result of workplace conditions.

224.   On or about January 3, 2009, due to the large amount of LWOP which the Agency had forced plaintiff to take, the Agency changed her service computation date for retirement from February 27, 1995, to August 9, 1998, which adversely impacts her ability to retire.  The Agency made a similar change in plaintiff's leave service computation date for leave purposes, changing it from February 17, 1995, to May 25, 1995.

225.   During the year 2009, the Agency neglected to honor plaintiff's medical restrictions as imposed by her doctor.

226.   Throughout 2009, plaintiff had appointments with Dr. Pyfrom every four weeks to monitor her progress with her carpal tunnel syndrome.  At each visit, Dr. Pyfrom issued the

same medical restrictions, allowing plaintiff to keyboard/type four no more than 30 minutes per hour, no more than 4 hours a day of work, use of wrist braces, no lifting or carrying more than five pounds, and use of voice activated software.

227.   On October 2, 2009, OWCP decided that plaintiff was not entitled to workers' compensation benefits for her hand and wrist conditions based on the examinations of independent medical reviewers and return plaintiff was required to stay time.

228.   On October 26, 2009, Dr. Pyfrom issued plaintiff another medical note, updating her work restrictions to no more than 30 minutes of typing/keyboarding per hour, no more than four hours a day of keyboarding, no carrying or lifting of more than five pounds, and using a wrist-brace and voice-activated software.

229.   On or about November 9, 2009, Mr. Merkle sent plaintiff a memorandum rejecting her doctor's medical restrictions [in light of OWCP's order that she return to full duty.]

230.   Thus, although plaintiff's hands and wrists had not fully recuperated, the Agency forced plaintiff to return to work without restrictions or face severe financial hardship.

231.   From November 2009 to the present, the Agency has harassed plaintiff by looking through her personal hard drive at work in order to access her private documents that may relate to her EEO activities.

232.   On or about January 2, 2010, Ms. Mongelli retired from the Agency.

233.   Nonetheless, the Agency has still failed or refused to accommodate plaintiff's disabilities.

234.   Throughout 2010, plaintiff has continued her monthly appointments with Dr. Pyfrom and has received the same work restrictions.  Her lifting or carrying restrictions never exceeded ten pounds.

235.    Nevertheless, over the past couple of months, the Agency continued to create a hostile work environment for plaintiff by denying her work restrictions, as well as by retaliating against her for her EEO activities.

236.    On or about March 10, 2010, plaintiff received a letter from OWCP accepting her claim for left hand carpal tunnel syndrome.  Both of her wrists thus suffered from carpal tunnel syndrome.

237.    Despite the multiple medical notes issued by plaintiff's doctor, the Agency continued to ignore her medical restrictions and failed to provide full reasonable accommodations.

238.    On or abut June 11, 2010, Dr. Segun Dawodu conducted a nerve test for plaintiff's bilateral carpal tunnel condition.  The examination showed that her right hand nerve was still in poor condition.

239.    On or about July 23, 2010, plaintiff underwent surgery for carpal tunnel release for her left hand.

### D. STATEMENT OF CLAIMS

Count I:  Race Discrimination - Hostile Work Environment
(Title VII)

240.    Plaintiff adopts and incorporates by reference paragraphs 1-239 above.

241.    Title VII makes it unlawful for an employer, including the Agency, to discriminate in employment on, among other things, the basis of race.  42 U.S.C. §§ 2000e-2(a)(1), 2000e-16.

242.    The Agency continuously subjected plaintiff to a discriminatory hostile work environment based on her race, in violation of Title VII, 42 U.S.C. § 2000e-2(a).

243.   Thus, as indicated above, beginning in July 2007, the Agency continuously tolerated and fostered a hostile environment toward plaintiff based on her race.

244.   As described above, the Agency continuously discriminated against plaintiff (a) by holding her responsible for co-workers' responsibilities in 2007; (b) by continuously assigning work assignments in a discriminatory manner; (c) by continuously denying her advance sick leave in 2007 and 2008; (d) unfairly and repeatedly charging her as late during the relevant time period; (e) by continuously not permitting her to use medical leave while granting the requests from other, similarly situated employees; (f) by improperly adjusting her service computation dates; (g) by denying her a within-grade increase in 2008; and (h) and by not disciplining Ms. Mongelli for bumping plaintiff while she exited her cubicle on August 14, 2007.

245.   The foregoing incidents alleged by plaintiff were hostile, continuous and ongoing, composed an unlawful employment practice of racially discriminatory conduct, and were sufficiently severe or pervasive to establish a hostile work environment.

246.   Defendant knew or should have known of the hostile work environment to which it subjected Plaintiff, but failed to take action to stop such unlawful conduct.

247.   As a result, plaintiff has suffered and is suffering considerable injuries, including emotional distress, loss of present and future earnings, and other financial damages such as loss of leave, grade increase, and service computation dates.

### Count II:  Disability Discrimination
### (Rehabilitation Act)

248.   Plaintiff adopts and incorporates by reference paragraphs 1-247 above.

249.   At all relevant times -- namely since December 2005, plaintiff has been qualified individual with a disability within the meaning of the Rehabilitation Act, 29 U.S.C. § 791.

250.    The Agency has continuously subjected plaintiff to a discriminatory hostile work environment, based on her disability, in violation of the Rehabilitation Act, 29 U.S.C. § 791.

251.    Thus, as indicated above, beginning in July 2007, the Agency continuously tolerated and fostered a hostile environment toward plaintiff based on her disability.

252.    Since about 1998 plaintiff has suffered from asthma.

253.    Plaintiff's asthma has substantially impaired one or more of her major life activities, including breathing and working.

254.    Since March 2007, plaintiff has suffered from carpal tunnel syndrome (originally diagnosed as tendonitis), first of her right hand and wrist and then of her left hand and wrist, as well as and reflex sympathetic dystrophy.

255.    The symptoms of these conditions have significantly impaired some of her major life activities, including working, keyboarding, driving, lifting, and caring for herself.

256.    Despite her disabilities, plaintiff has been able, with or without reasonable accommodations, to perform the essential functions of her job for the Agency.

257.    As described above, the Agency continuously discriminated against plaintiff on the basis of her disabilities, (a) by continuously denying her reasonable accommodations for her disabilities since July 2007, when she complained that she was suffering from severe asthma due to her workspace; (b) by not satisfying the work restrictions ordered by doctors for her hand/wrist condition; (c) by repeatedly denying her advanced sick leave, while granting it to similarly situated employees; and (d) and by continuously not engaging in the interactive process with respect to her disabilities.

258.    The foregoing incidents alleged by plaintiff were hostile, continuous and ongoing, composed an unlawful employment practice of discrimination based on disability, and were sufficiently severe or pervasive to establish a hostile work environment for plaintiff.

259.    As a result of the above-described discrimination, plaintiff has suffered and is suffering injuries, including exacerbation of her asthma and carpal tunnel syndrome conditions, considerable emotional distress, loss of present and future earning, and other financial damages such as loss of leave, denial of a within-grade increase, and improper changes in her service computation dates.

Count III:  Retaliation
(Under Title VII)

260.    Plaintiff adopts and incorporates by reference paragraphs 1-259 above.

261.    Title VII, 42 U.S.C. § 2000e-3(a), and regulations promulgated thereunder prohibit agencies of the Federal Government from retaliating against an employee for complaining about practices which the employee reasonably and in good faith believes are discriminatory, as well as for initiating and processing administrative EEO complaints.

262.    As indicated above, in March 2005, plaintiff filed an EEO complaint against the Agency.

263.    By opposing perceived race discrimination on the job, plaintiff has engaged in other protected activities.

264.    On or about April 25, 2007, plaintiff began her most recent EEO activities by asking Ms. Brockmann, OJP EEO Director, about the criteria for filing an EEO complaint.

265.    In opposing alleged discrimination by the Agency and in filing and pursuing her administrative EEO complaint, as described above, plaintiff has engaged in activities protected by Title VII, 42 U.S.C. § 2000e-3(a).

266.    The Agency was aware of all of plaintiff's protected activities at or about the times she engaged in them.

267.    As described above, the Agency became aware of plaintiff's most recent EEO complaint on or about August 7, 2007.

268.    Subsequently, the Agency retaliated against plaintiff by continuing to discriminate against her.

269.    Further, in August 2007 the Agency, through Ms. Mongelli, one of its agents, physically assaulted plaintiff when and because she attempted to engage in further EEO activity.

270.    As a result of the defendant's retaliation against her, plaintiff has suffered and is suffering considerable injury, including emotional distress, loss of present and future earnings, and other financial damages such as loss of leave, denial of a within-grade increase, and improper changes in her service computation dates.

Count IV:  Retaliation
(Under Rehabilitation Act)

271.    Plaintiff adopts and incorporates by reference paragraphs 1-270 above.

272.    The Rehabilitation Act, 29 U.S.C. §791, and regulations promulgated thereunder prohibit agencies of the Federal Government from retaliating against an employee for complaining about disabilities practices which the employee reasonably and in good faith believes are discriminatory, including alleged disability discrimination, and unreasonable failures to accommodate, as well as for initiating and processing administrative EEO complaints of disability discrimination.

273.    As stated above, since July 2007, plaintiff has continuously objected to the Agency's refusals or failures to grant her reasonable accommodations and has opposed perceived disability discrimination against her.

274.    In so doing, plaintiff has engaged in protected activities.

275.    In opposing alleged discrimination by the Agency and in filing and pursuing her administrative EEO complaint, as described above, plaintiff has engaged in activities protected by the Rehabilitation Act, 29 U.S.C. § 791, and regulations promulgated thereunder.

276.    The Agency was aware of all of plaintiff's protected activities at or about the times she engaged in them.

277.    As described above, the Agency retaliated against plaintiff by continuing to discriminate against her with regard to her disabilities and by Ms. Mongelli's physical assault on plaintiff in August 2007, when she was about to engage in further EEO activity.

278.    As a result of the defendant's retaliation against her, plaintiff has suffered and is suffering considerable injury, including emotional distress, loss of present and future earnings, and other financial damages such as loss of leave, denial of a within-grade increase, and improper changes in her service computation dates.

### E.  REMEDIES SOUGHT

279.    WHEREFORE, plaintiff respectfully requests that the Court issue a judgment granting her the following relief from defendant:

a.      A declaratory judgment that the Agency discriminated and retaliated against plaintiff as alleged herein;

b.      An order reassigning her to a position elsewhere in the Agency at the same grade level she now has, in which she would not need to keyboard as much as she now does, such in the External Oversight Branch, Grants Financial Management Division;

c.      Provide her reasonable accommodations for her disabilities, such as the following:  (1) ergonomic mouse; (2) voice-activated software which is compatible with the

Agency financial software; (3) no time-constraint deadlines outside of her regular work limitations; (4) a humidifier for her office; (5) reasonable leave to see doctors or when she is medically advised to remain off work; and (6) provide a workspace that is climate controlled;

        d.      Reimbursement for her attorneys' fees and costs pursuant to the Rehabilitation Act, 29 U.S.C. § 794a, and the Civil Rights Act of 1990, 42 U.S.C. § 1981a(1) and (2);

        e.      Compensatory damages in the amount of $300,000 for emotional distress and aggravation of her disabilities, pursuant to the Rehabilitation Act, 29 U.S.C. § 794a, and the Civil Rights Act of 1990, 42 U.S.C. § 1981a(b);

        f.      Restoration of 251 hours of leave which the Agency denied plaintiff between 2007 and 2008;

        g.      A within-grade increase to make up for the delay of her within-grade increase in March 2008;

        h.      Restoration of plaintiff's retirement service computation date from August 9, 1995, to February 27, 1995; and

        i.      Restoration of plaintiff's leave computation date from May 25, 1995 to February 17, 1995.

## F. EXHAUSTION OF ADMINISTRATIVE REMEDIES

280.    Plaintiff has satisfied all administrative prerequisites for filing suit under Title VII and the Rehabilitation Act.

281.    On or about July 25, 2007, plaintiff initiated an informal EEO complaint with the Agency's EEO office, in which she complained that Ms. Mongelli was creating a hostile work

environment for her, failing to accommodate her disabilities, and discriminating against her on the basis of her race.

282.    On or about October 25, 2007, plaintiff filed a formal EEO complaint, in Agency Case No OJP-2008-00019, and she filed an amended complaint on January 31, 2008.

283.    The complaint contained essentially the same claims as this Complaint presents.

284.    On or about May 25, 2008, the Agency completed an investigation of plaintiff's complaint.

285.    On or about November 13, 2008, plaintiff formally requested a hearing before EEOC, and EEOC later assigned the case to an administrative judge.

286.    The parties engaged in discovery through July 2009, though plaintiff was unable to complete her discovery.

287.    On August 17, 2009, plaintiff filed a motion to withdraw her request for a hearing, and to remand the case to the Agency for issuance of a Final Agency Decision (FAD).

288.    On the same day, the Administrative Judge granted that motion and remanded the case to the Agency.

289.    On or about April 29, 2010, the Agency issued a FAD, as well as a notice that she could file a complaint in court within 90 days after receipt of the FAD.

290.    On or about May 1, 2010, plaintiff received the FAD and notice of her right to sue.

291.    This complaint is being filed within 90 days after plaintiff received the FAD and is therefore timely.

292.    Plaintiff has exhausted all required administrative remedies before filing her Complaint herein.

35

## G.  JURY DEMAND

293.    Plaintiff requests a jury trial on all issues of fact and damages arising herein.

### VERIFICATION

I hereby certify under penalty of perjury that I am the plaintiff in the above-captioned

case; that I have read the foregoing Verified Complaint; and that the facts related

herein are true and correct to the best of my knowledge, information, and belief.

Executed at Silver Spring, Maryland, this *30* day of July, 2010.

RHONDA SMITH

Respectfully submitted,

/s/ Alan Banov
ALAN BANOV #95059
Alan Banov & Associates
8401 Colesville Road, Suite 325
Silver Spring, MD 20910
301-588-9699; fax: 301-588-9698
abanov@banovlaw.com
Attorney for Plaintiff