**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

RHONDA SMITH,

               Plaintiff,

               v.

LORETTA LYNCH,
*Attorney General of the United States*

               Defendant.

Civil Action No. 10-1302 (BAH)

Judge Beryl A. Howell

<u>**MEMORANDUM OPINION**</u>

The plaintiff, Rhonda Smith, has been a long-time employee of the Department of Justice's ("DOJ") Office of Justice Programs ("OJP") and, since July 2006, worked as a GS-13 staff accountant in OJP's Customer Service Branch.  Compl. ¶¶ 7, 21, ECF No. 1.  She filed this suit against the defendant, Attorney General, in her official capacity,[1] alleging that, between 2007 and 2009, she was subjected to a hostile work environment and retaliation because she is African-American and suffered from carpal tunnel syndrome ("CTS") in her right hand, in violation of Title VII, 42 U.S.C. §§ 2000e *et seq.*, and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.*  Compl. ¶¶ 240–79.  Pending before the Court is the defendant's Renewed Motion to Dismiss or, in the Alternative, for Summary Judgment ("Def.'s Mot."), ECF No. 55, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 56.  For the reasons set forth below, the defendant's motion is granted.

---

[1] The plaintiff originally named former Attorney General Eric Holder Jr. as the defendant in this case.  Pursuant to Federal Rule of Civil Procedure 25(d), the Court automatically substitutes his successor, Loretta Lynch, as the new defendant.

I.      **BACKGROUND**

The plaintiff has alleged myriad forms of mistreatment by OJP over a span of several years, allegedly due to both her race and her CTS.  *See generally* Compl.  Although the plaintiff initially alleged that the defendant failed to accommodate her asthma and that the defendant "discriminated against her by 'improperly adjusting her service computation dates' and 'delaying her a [sic] within-grade increase in [salary in] 2008,'" the plaintiff subsequently withdrew those claims.  Pl.'s Opp'n Def.'s Mot. ("Pl.'s Opp'n"), ECF No. 59 at 2 n.1–2.[2]  Set out below is background to assess the five[3] remaining actions by OJP that the plaintiff alleges establish her claims of racial and disability discrimination, hostile work environment, and retaliation.  *See id.* ¶¶ 2–3.

A.      **The Plaintiff's Leave History And Onset Of CTS Symptoms**

Approximately two months after the plaintiff started in her role as a staff accountant in the OJP's Customer Service Branch, in September 2006, she was issued a "Memorandum of Counseling and Possible Leave Restriction" by her first-line supervisor, Darlene Mongelli.  *See* Pl.'s Opp'n Ex. 14 (the "Leave Counseling Memo") at 1, ECF No. 59-19.[4]  The Leave Counseling Memo noted that, as of September 15, 2006, the plaintiff had accrued two hours of

---

[2] The plaintiff and defendant filed nearly one hundred exhibits, with multiple duplicates, with their memoranda in support of and opposition to the instant motion.  *See, e.g.*, Def.'s Mot. Ex. 31 (Leave Counseling Memo issued to plaintiff); Pl.'s Opp'n Ex. 14 (identical exhibit).  Although each exhibit and submission from the parties has been reviewed, only those exhibits necessary to provide context for resolution of the instant motion are cited herein.

[3] The Complaint and the plaintiff's briefing refer to six OJP actions, but two of the actions described by the plaintiff amount to the same thing, namely, denying the plaintiff the use of advance sick leave.  *See* Pl.'s Opp'n ¶ 2(c) (stating hostile work environment based on "continuously denying [the plaintiff] advance sick leave in 2007 and 2008"); *id.* ¶ 2(e) (stating hostile work environment based on "continuously not permitting [the plaintiff] to use advance leave for medical related absences while granting requests from other, similarly situated employees who were not African-American or disabled").

[4] The defendant asserts that the Leave Counseling Memo was effective in August 2006, *see* Def.'s Statement of Material Facts Not In Genuine Dispute ("Def.'s SMF") ¶ 4, ECF No. 55, but this document, which bears no issuance date, refers to leave the plaintiff had accrued as of September 15, 2006, and is signed and dated by the plaintiff and her supervisor as of September 28, 2006.  *See* Leave Counseling Memo at 1, 4.  Based on these contents, the Leave Counseling Memo appears to have been issued and became effective sometime in September 2006.

annual leave, 134.50 hours of leave without pay (LWOP), and a deficit of 114.75 hours of sick leave. *Id.* The Leave Counseling Memo stated that the plaintiff's prior leave history "shows that there is a long-term pattern of frequent unscheduled absences." *Id.* The plaintiff was advised that she "must improve [her] attendance," *id.*, and she was given specific procedures to follow before taking additional leave, *id.* at 2–4. Specifically, the Leave Counseling Memo stated the plaintiff "**must** obtain verbal approval of" any unscheduled leave and that she submit requests for scheduled leave "at least 1 workday prior to the scheduled leave." *Id.* at 2 (emphasis in original). The Leave Counseling Memo further warned that if the plaintiff were "absent without leave having been approved, the absence [would] be recorded as absence without official leave (AWOL)." *Id.*

The plaintiff was specifically required by the Leave Counseling Memo "to promptly arrive at work at [her] regularly scheduled time . . . and to work [her] tour of duty each workday." *Id.* at 3. The Leave Counseling Memo required that the plaintiff notify the plaintiff's supervisor or second line supervisor, Joanne Suttington, if the plaintiff were running late, *id.*, and required that she submit "the original copy of a medical certificate signed by the attending physician" for any medical absence resulting in more than three consecutive missed days of work, *id.* at 3.[5] The plaintiff avers that the Leave Counseling Memo "did not take into account the fact that Plaintiff's absence [sic] had resulted largely from three operations and asthma attacks." Pl.'s Response to Def.'s Statement of Material Facts not in Genuine Dispute ("Pl.'s SMF") ¶ 4, ECF No. 59-2.

---

[5] Mongelli interpreted this requirement as referring to "[t]he original signed copy that's in ink" of any medical documentation supporting requested sick leave. Def.'s Reply Pl.'s Opp'n Def.'s Mot. ("Def.'s Reply") Ex. 2 at 290:2, ECF No. 62-2.

Beginning in March 2007, the plaintiff experienced pain in her right hand and wrist. *See* Def.'s Statement of Material Facts Not in Genuine Dispute ("Def.'s SMF") ¶ 8, ECF No. 55; Pl.'s SMF ¶ 8. OJP was first alerted to the plaintiff's symptoms when she submitted a note from her doctor stating she was "totally incapacitated" from March 23 through March 30, 2007. Def.'s Mot. Ex. 20 at 4, ECF No. 56.[6] That period of total incapacitation was later extended through April 16, 2007, after the plaintiff submitted another note from her physician. Def.'s Mot. Ex. 21 at 6, ECF No. 56. The plaintiff returned to "light duty status lifting no more than 5 pounds" on April 17, 2007, Def.'s Mot. Ex. 22 at 8, ECF No. 56, but was prohibited from "keyboarding" from May 4 through May 8, 2007, Def.'s Mot. Ex. 23 at 10, ECF No. 56. The record indicates that the plaintiff had no restrictions on her work from May 9, 2007 through June 29, 2007, when the plaintiff submitted a physician's note stating the plaintiff had "Right Carpal Tunnel Syndrome" and she was "to avoid using the keyboard for the next 30 days." Def.'s Mot. Ex. 24 at 12, ECF No. 56. Thus, the plaintiff provided documentation of temporary work restrictions covering March 23, 2007 through May 8, 2007, and June 29, 2007 through July 29, 2007. *See supra.*

On July 3, 2007, OJP's Reasonable Accommodations Coordinator, Phillip Merkle, "informed Plaintiff of her right to request a reasonable accommodation." Pl.'s SMF ¶ 11. Three days later, the plaintiff left a voicemail for an OJP human resources representative, indicating that she "had spoken with her doctor, and he is recommending that [the plaintiff] wait until all of her test results are in and [her doctor] has reviewed them before she completes the reasonable accommodation documentation." Def.'s Mot. Ex. 25 at 7, ECF No. 55-20. The plaintiff avers that her doctor told her that "he would be unable to make [the] assessment" as to whether her

---

[6] The defendant filed several exhibits in a single, sealed document at ECF No. 56. Page number citations in that combined set of exhibits reference the ECF page number, not the page number of the individual exhibit.

condition was "long-term or permanent" until after the plaintiff had been seen by a specialist. Pl.'s SMF ¶ 12.

Nine days prior to the expiration of her keyboarding restrictions, on July 20, 2007, the plaintiff received a memorandum from her supervisor advising the plaintiff that she was not "expect[ed] to report back to work until your doctor indicates that you can resume your full duties and responsibilities." Def.'s Mot. Ex. 26 at 2, ECF No. 55-21. The memorandum advised the plaintiff that OJP would approve accrued leave or leave without pay ("LWOP"), but not advance leave, due to [the plaintiff's] negative leave balance." Pl.'s SMF ¶ 13. The plaintiff signed the memorandum to acknowledge receipt, but wrote along with her signature that "[t]he information contained in this memorandum is not accurate." Def.'s Mot Ex. 26 at 2. Pursuant to the memorandum directing the plaintiff to advise her supervisor "within five (5) calendar days" of any information "which [the plaintiff] believe[d would] assist [OJP] in the review of this matter," *id.*, the plaintiff "wrote a memo to her supervisor, Ms. Mongelli, indicating that her 30-day keyboarding restriction was to expire on July 28, 2007, and [the plaintiff] anticipated 'being able to fully resume all of [her] duties'" as of that date, Pl.'s SMF ¶ 14. Following the expiration of the plaintiff's total keyboarding restriction, the plaintiff "submitted a doctor's note, dated July 30, 2007, indicating that [the plaintiff] 'will be able . . . to return to work . . . with restrictions' and that she '(1) use a brace [and] (2) keyboard 4 hours/day with breaks every hour of typing for 5 minutes.'" Pl.'s SMF ¶ 16; *see* Def.'s Mot. Ex. 27 at 14, ECF No. 56.[7]

---

[7] While OJP invited the plaintiff to request reasonable accommodation in early July, Pl.'s SMF ¶ 11, this request was not forthcoming until August 1, 2007, when the "[p]laintiff submitted a Reasonable Accommodation Request form regarding her right hand condition to Mr. Merkle." Pl.'s SMF ¶ 17. The next day, Merkle requested, in an email to the plaintiff dated August 2, 2007, additional information from the plaintiff's physician because the plaintiff's request for reasonable accommodation "lack[ed] the specificity required to make a determination in [the plaintiff's] case." Def.'s Reply Ex. 4 at 2, ECF No. 62-4. Subsequent emails between Merkle and the plaintiff indicate that Merkle did not receive the requested information in a timely manner. *See id.* at 11 (Merkle informing plaintiff in emails in October 2007, that he still needed the documents he requested in August 2007); *id.* at 18 (Merkle stating in email to plaintiff, dated January 18, 2008, that he "wanted to touch base with [the plaintiff] as

The plaintiff underwent carpal tunnel release surgery in January 2008 and returned to work six months later, in July 2008.  Compl. ¶¶ 205, 207.  While the plaintiff was recuperating from surgery, OJP rearranged the plaintiff's office furniture and installed an ergonomic keyboard.  *See* Pl.'s Opp'n Ex. 7 at 12, ECF No. 59-12.  OJP personnel also researched and installed voice activated software on the plaintiff's computer.  Def.'s Reply Ex. 5 at 3–6, ECF No. 62-5.  Less than a month after the plaintiff returned to work, the plaintiff once again went out on medical leave for four weeks because she was "physically unable to work at all."  Pl.'s Opp'n Ex. 34, at 1, ECF No. 59-33.

### B.      Alleged Discriminatory And Retaliatory Incidents

The five OJP actions, *see supra* at 2, underlying the plaintiff's claims are related primarily to conduct alleged to have occurred between March and August 2007, during which time the plaintiff was absent from work for approximately thirty percent of the possible work days.[8]  The alleged conduct is detailed below.

### 1.      *Holding Plaintiff Responsible For Co-Workers' Assignments (April–June 2007)*

The plaintiff claims that she was held responsible for her co-workers' assignments, known as "closeouts."  Compl. ¶¶ 104–107; 125–128.  The plaintiff was originally assigned to review two co-workers closeouts but, when she was out on leave in March and April of 2007, the plaintiff's supervisor reassigned those duties to Wendy Lynch, who is Asian-American.  Pl.'s

---

almost three months have passed since I last heard from you regarding your request for reasonable accommodation related to your wrist.  I am prepared to consider your request as soon as you can provide the information requested . . . .").

[8] This percentage is determined by calculating the number of working days on which the plaintiff was totally prohibited from working, according to her doctor's or her supervisors' orders, as provided in the parties' exhibits, and dividing that number into the total number of working days between March 23, 2007, when the plaintiff first submitted documentation of being unable to work, and July 29, 2007, when the plaintiff's total keyboarding restriction was lifted.  The number of days on which the plaintiff was absent is likely higher, given that some of the parties' exhibits refer to absences not related to her medical condition.  *See* Pl.'s Opp'n Ex. 25 at 2–3, ECF No. 59-26.

Opp'n Ex. 4 at 19, ECF No. 59-9.  The plaintiff states that on June 25, 2007, she received an e-mail from Mongelli stating "that the reassignment of review responsibilities [away from the plaintiff] was only for the duration of [the plaintiff's] absence," and instructed the plaintiff to resume reviewing one of her co-worker's closeouts.  *Id.* at 20.  The plaintiff alleges that neither she nor her co-workers were informed of this arrangement before June 25, 2007, and that one closeout reassigned to the plaintiff for review should have been reviewed by Lynch.  *See id.* at 19–20.  The plaintiff avers that this reassignment of work was an example of discrimination and the creation of a hostile work environment based on race because other people in similar circumstances, particularly Lynch, were not treated the same way in similar circumstances.  *Id.*

## 2.     *Assigning Work In A Discriminatory Manner (June 2007)*

The essence of the plaintiff's work assignment discrimination claim is that the plaintiff's supervisor "had a different expectation" of Lynch "than she did for Plaintiff in similar situations."  Pl.'s Mem. Supp. Pl.'s Opp'n Def.'s Mot. ("Pl.'s Opp'n Mem.") at 28, ECF No. 59-1.  The plaintiff avers that Mongelli "discriminated against [her] based on [her] race and disability in assigning [her] the First Quarter Excess Cash project and expecting [her] to do it in June when [she] was under a medical keyboarding restriction," but physically present at work.  Pl.'s Opp'n Ex. 1 ¶ 9, ECF No. 59-5.[9]  The plaintiff was originally assigned this project on February 23, 2007 by Mongelli, Pl.'s Opp'n Ex. 36 at 51:11-14, ECF No. 60-1, but it was reassigned to a co-worker, Max Mirin ("Mirin") on April 4, 2007, *id.* at 52:20–53:2.  Mongelli asserts that "[b]y the end of May, it became clear that [Mirin] was not experienced and familiar enough with the project to successfully complete it," Def.'s Mot. Ex. 14 at 3, ECF No. 55-14.

---

[9] The First Quarter Excess Cash project ("Excess Cash Project") involved reviewing the "financial status reports that grantees have submitted for the most current quarter end and comparing that to the amount of money that they have drawn down off of the [sic] their grant to determine if their expenditures equal or exceed their draw downs."  Pl.'s Opp'n Ex. 36 at 51:21–52:5, ECF No. 60-1.

On June 9, 2007, the plaintiff participated in a meeting where she was informed that "the first quarter '07 excess cash report had never been completed," Pl.'s Opp'n Ex. 36 at 58:1-2, and the plaintiff contends that she learned via e-mail in late June that the project had been returned to her. *Id.* at 58:3-8. The Excess Cash Project was to be completed by August 9, 2007, but the plaintiff states she was unable to complete the project by the deadline due to her keyboarding restriction. *See id.* at 62:18–63:9.

The plaintiff alleges that she should not have been reassigned the Excess Cash Project and notes that Lynch "was assigned the second and the third quarter excess cash report project [and] went out on leave during both of those projects . . . [h]er project was reassigned to someone else, and was never given back to her when she returned from her vacation." *Id.* at 63:9-16. According to the plaintiff, other employees completed Lynch's assignments, though she offers no evidence other than her own statements and assertions of to whom the reports were reassigned for this contention. *See id.* at 64:7–67:5. Mongelli, who assigned the projects to both the plaintiff and Lynch, disputes this assertion, stating that Lynch was held responsible for completing her excess cash projects despite the leave she took, and that Lynch "finished [the projects] before she went – before she left. She came in on the weekend before." Def.'s Mot. Ex. 16 at 191:22–192:7, ECF No. 55-16.[10] The plaintiff contends that the reassignment of the first quarter project back to the plaintiff was an instance of Mongelli's attempt "to make [the plaintiff's] working atmosphere adverse and hostile," Pl.'s Opp'n Ex. 36 at 68:6-7, since

---

[10] Mongelli also notes that when Lynch took leave she was not subject to a leave counseling memo and she had a large amount of accumulated sick and annual leave available. Def.'s Mot. Ex. 16 at 190:1-15. An affidavit from the director of OJP's Human Resources division further confirms that Lynch had over three hundred hours of accumulated annual and sick leave available between May and September of 2007, while the plaintiff never accumulated more than eleven hours of annual leave and owed at least sixty-six hours of sick leave during the same period. Def.'s Mot. Ex. 45 ¶¶ 2–6, ECF No. 55-26.

Mongelli expected the plaintiff to fail to complete the project on time and Mongelli "could [then] take adverse action against [the plaintiff]," *id.* at 68:7-12, for the failure.

### 3.    *Denying Advance Sick Leave (March to July 2007)*

The plaintiff states that she was allowed to take *regular* leave as she accrued it, Def.'s Mot. Ex. 12 at 98:10-12, ECF No. 55-12, but cites several instances of being denied *advance* sick leave as support for her contentions that she was discriminated against, subjected to a hostile work environment, and retaliated against on the basis of her alleged disability.  DOJ has a formal written policy outlining the requirements for requesting and granting advance sick leave, Def.'s Mot. Ex. 35, ECF No. 55-27, and that policy is explained first, before discussing the specific instances challenged by the plaintiff.

### a)    *DOJ's Advance Sick Leave Policy*

Under DOJ's leave policy, an employee generally "must submit a request for advance sick leave as far in advance of the requested period of absence as possible," though allowances can be made "[i]n the event of injury or sudden illness" when "advance sick leave may be granted after the fact provided the employee submits any documentation required in support of the request within the time frame established by the approving official."  Def.'s Mot. Ex. 35 ¶ 34(b)(1).  Specifically, an employee "must submit the following: (a) A Standard Form 71, Application for Leave. (b) A medical certificate or other administratively acceptable evidence substantiating the reason(s) for the absence. (c) Such additional documentation as the Department component or approving official may prescribe."  *Id.* ¶ 34(b)(2).

The policy states that "[e]mployees do not have a vested right to advance leave, regardless of the circumstances, and the approval of requests for advance sick leave is at the discretion of the approving official."  *Id.* ¶ 34(c)(1).  Approving officials are to consider enumerated factors before granting such leave, including: "(a) Whether the employee can be

expected to return to duty. (b) The need for the employee's services. (c) The benefits in retaining this employee. (d) The fact that, if the employee separates because of disability or illness (whether by retirement or resignation), the Department has no authority to require repayment of the amount paid to the employee for advance leave." *Id.* The ultimate decision is "entirely up to the discretion of the supervisor." Pl.'s Opp'n Ex. 10 at 53:11-12, ECF No. 59-15. "Approving officials may not grant advance sick leave" if the employee "has indicated an intention to resign for disability[;]" "a separation date has been established which would preclude the employee from earning enough leave to repay the advance sick leave[;]" or "there is other evidence that the employee will not return to duty." Def.'s Mot. Ex. 35 ¶ 34(c)(2).

In the plaintiff's division, the plaintiff's second line supervisor, Suttington, set additional requirements for granting advance sick leave, noting that (1) "[a]ny request for advance leave must be authorized by the [Chief Financial Officer][;]" (2) the leave "must be requested in advance[;]" (3) the "request for advance leave should be written and include the time period for the leave[;]" (4) "[a]dequate documentation should be attached to support the request, e.g., physician's note justifying the need for leave[;]" (5) the "employee's advance sick leave balance cannot exceed -240 hours;" and (6) "[a]dvance annual leave is limited to the amount that the employee earned and [could] payback [sic] by the end of the year, i.e., the projected year end balance cannot be less than zero." Def.'s Mot. Ex. 36 at 2, ECF No. 55-28.

### b) *The March 2007 Denial*

On March 23, 2007, the plaintiff submitted a request for advance sick leave, along with a doctor's note stating she was totally incapacitated. *See* Def.'s Mot. Ex. 20 at 4. In an email exchange between Mongelli and OJP's Human Resources ("HR") division, Mongelli advised that she received "a leave slip for Advanced [sic] Sick Leave dated 3/23" from the plaintiff, along "with some documentation. The documentation is NOT an original document." Pl.'s

Opp'n Ex. 16 at 4, ECF No. 59-20 (capitalization in original).  Mongelli told the HR personnel in

the email that "[t]here are work assignments that could be completed without keyboarding," and

that Mongelli did not plan to approve any "leave at all based on this request."  *Id.*  Mongelli was

instructed by HR to record the plaintiff's leave as leave-with-out-pay LWOP, and recommended

that Mongelli "provide [the plaintiff] with a leave restriction letter based on her continued pattern

of leave abuse."  Pl.'s Opp'n Ex. 19 at 4, ECF No. 59-22.

*c)*    *The April 2007 Denial*

On April 2, 2007, Mongelli informed a DOJ HR specialist, Veronica (Tina) Hudson via

email that the plaintiff "plan[ned] to come in [that day] just long enough to drop off paperwork

for the Leave Bank program" and that the plaintiff would "be out 2 more weeks."  Pl.'s Opp'n

Ex. 19 at 3, ECF No. 59-22.  Mongelli requested a meeting with the plaintiff to discuss the

request.  *Id.*  At the meeting, which the plaintiff attended with a representative from her union,

Mongelli "advised [the plaintiff] that [she] needed to come to work because [Mongelli] was not

willing to advance [the plaintiff] leave."  Pl.'s Opp'n Ex. 36 at 99:12-15, ECF No. 60-2.

The plaintiff alleges that during this meeting, Mongelli told the plaintiff "there was plenty

of work that could be done without" requiring the plaintiff to use a keyboard.  *Id.* at 100:1-3.

Mongelli avers that the plaintiff's "union rep recommended that as a compromise, [the plaintiff]

come in for 1/2 days beginning today [April 3, 2007].  [Mongelli] agreed."  Pl.'s Opp'n Ex. 19 at

2.  The plaintiff alleges that Mongelli "stated she would provide [the plaintiff] with a list of

written duties that [she] could do that didn't require the use of [her] hand," but she was never

provided with the requested list.  Pl.'s Opp'n Ex. 36 at 101:2-8.

The next day, the plaintiff stated that she visited "personnel and once they reviewed [her]

doctor's notes ordering [the plaintiff] to remain home [and] stating [she] was totally

incapacitated" that the personnel office advised the plaintiff's supervisors that it was a "risk and

11

a liability" for the plaintiff to remain at work.  *Id.* at 100:10-21.  The plaintiff avers that her

second-line supervisor, Suttington, informed her at the end of the working day on April 3, 2007

"that [the plaintiff] should not be at work, and [the plaintiff] should go home and remain home

until [she] was cleared by [her] doctor."  *Id.* at 105:15-20.  Subsequently, Mongelli denied the

plaintiff's request for eighty hours of advance sick leave for the period from April 2 through

April 13, 2007, citing the plaintiff's negative sick leave balance and available annual leave

balance of .25 hours.  Pl.'s Opp'n Ex. 20 at 2, ECF No. 59-23.  The plaintiff's absence was

charged to leave without pay.  *Id.*

<em>d)      The July 2007 Denial</em>

From June 29, 2007 to July 29, 2007, the plaintiff was under doctor's orders to avoid

keyboarding.[11]  *See supra* Part I.A.  The plaintiff worked under this restriction, reviewing

Mirin's work, until July 20, 2007, when the plaintiff was given a memorandum from Mongelli,

Def.'s Mot. Ex. 26, instructing the plaintiff "to go home until [she] could perform [her] duties

100 percent," Pl.'s Opp'n Ex. 36 at 27:20–28:15.  The memorandum stated that the plaintiff's

"inability to use the keyboard render[ed her] unable to perform 85% of the duties and

responsibilities of [her] position," and further stated that the reviewing tasks the plaintiff had

been performing "are but a small part of [the plaintiff's] regular work assignments."  Def.'s Mot.

Ex. 26 at 2.  Moreover, the memo stated that the plaintiff's "primary work assignments [were] to

process closeouts" and that she had "closed 176 of the 531 closeouts assigned" to her since April

---

[11] The plaintiff cites an email between Suttington and Mongelli in July 2007 as evidence of the alleged hostile work environment.  Pl.'s Opp'n Mem. at 12.  Suttington wrote in an email to Mongelli that Suttington "believe[d] that this issue has gotten out of control.  So, why do we bother to try to appease [the plaintiff]?  [The plaintiff] is going to blame us for all of her issues anyway and she is probably not going to be that productive in the work place."  Pl.'s Opp'n Ex. 29 at 2, ECF No. 59-29.

2007, which was substantially less that the "3 to 5 [closeouts] per day" a GS-13 staff accountant such as the plaintiff was expected to complete. *Id.*

The memorandum stated that the plaintiff's "inability to produce at the average GS-13 level and [her] dependence on other staff members [was] affecting the ability of the Branch to meet its goals." *Id.* at 3. Consequently, OJP was "not willing to approve any requests for advance sick or advance annual leave due to [the plaintiff's] current leave status." *Id.* at 3. This did not mean that the plaintiff was not allowed to take *any* leave; the memorandum indicated that OJP would "approve any request . . . to use any *accrued* sick or annual leave or to use leave without pay (LWOP) to cover [the plaintiff's] absences through the end of the remaining 30 day period," and that the plaintiff could apply for two voluntary leave bank donor programs or leave under the FMLA. *Id.* (emphasis added). The plaintiff was afforded the opportunity to provide "within five (5) calendar days from" July 20, 2007, the date of the memorandum, "any additional information, including documentation from [her] doctor, which [she] believe[d would] assist [DOJ] in the review of" her status, if the plaintiff did not agree with the memorandum's assessment. *Id.*

Three days after receiving the memorandum alerting her that no requests for advance sick leave would be approved, the plaintiff nonetheless submitted, on July 23, 2007, a request for advance sick leave, Def.'s Mot. Ex. 30 at 2, ECF No. 55-23, which was denied, Pl.'s Opp'n Ex. 36 at 32:12-14.[12]

> e)    *The Plaintiff's Belief That Advance Sick Leave Denials Were Discriminatory*

The plaintiff alleges that the denial of her advance sick leave requests was discriminatory because "there were others that were being advanced leave or there were [sic] speculation that

---

[12] The plaintiff avers that she was advised to make the request by her union representatives. Pl.'s Ex. 36 at 32:8-12.

others were being advanced leave," who were not African-Americans.  *See* Pl.'s Opp'n Ex. 3 at

92:19–93:1, ECF No. 59-8.  The plaintiff does not identify who these "others" were, stating that

she "didn't go to the non-African Americans to say are you getting advanced leave, you know,

was yours advanced, but because people's business never stayed personal in our office,

somewhere along the line, somebody, whether it was the time keeper or somebody in the front

office, would say well so and so just got their leave approved, but this one's leave was denied."

*Id.* at 93:2-10.  The plaintiff stated that she obtained the information supporting this allegation

"secondhand" and not "from the source," *id.* 93:18-24, and was unable to name any co-workers

who had their advance leave requests denied, *id.* at 95:5-17.

### 4.    *Charging Plaintiff With Tardiness (2007 generally)*

The plaintiff claims that she was racially discriminated against because she was forced to

take leave if she arrived to work late, while other employees were given a fifteen minute "grace

period" after their scheduled start times.  *See* Pl.'s Opp'n Ex. 3 at 99:1-18.  Specifically, the

plaintiff claims that if she failed to arrive at work by 8:00 a.m., Mongelli would require her to

submit a leave slip for the time period between 8:00 a.m. and 8:15 a.m.  *See id.* at 101:6-23.  The

plaintiff named three non-African-American employees in the customer service branch who were

not required to submit leave slips in similar circumstances.  *See id.* at 102:1–104:24.  The

plaintiff avers that this state of affairs ended after the plaintiff returned from her carpal tunnel

release surgery in 2008.  *Id.* at 111:8-13.

### 5.    *The Alleged Assault (August 14, 2007)*

A portion of the plaintiff's hostile work environment and retaliation claims, based on race

and disability, pertains to an August 14, 2007 incident, in which the plaintiff claims she was

assaulted and battered by Mongelli.  *See* Pl.'s Opp'n Mem. at 15–17.  No witnesses to this

incident, aside from the plaintiff and Mongelli, are identified.  *See* Pl.'s Opp'n Ex. 36 at 85:16-

19.  The investigator assigned to resolve the matter wrote that his "analysis of the incident is inconclusive."  Def.'s Mot. Ex. 41 (Report of Investigation ("Inv. Rep.")) at 2, ECF No. 55-33.

On the morning of August 14, 2007, Mongelli and the plaintiff sent each other a series of emails regarding an alleged inaccuracy in the plaintiff's leave slips.  *See id.*; Pl.'s Opp'n Ex. 9 at 203:21–205:12, ECF No. 59-14.  At approximately 12:30 p.m., Mongelli went to the plaintiff's cubicle to discuss the matter with her.  Inv. Rep. at 2; *see* Pl.'s Opp'n Ex. 9 at 205:6-15; Pl.'s Opp'n Ex. 36 at 77:15-18.  Mongelli states she was frustrated with the plaintiff at the time, walked into the plaintiff's cubicle unannounced, looked over the plaintiff's shoulder, saw that the plaintiff was composing an e-mail, and said "More e-mails."  Pl.'s Opp'n Ex. 9 at 206:2-10; *id.* at 207:12–208:6; Pl.'s Opp'n Ex. 4 at 24.

"At this point, the parties do not agree about what happened next."  Inv. Rep. at 2. According to Mongelli, the plaintiff became angry and told Mongelli "she was sick of [Mongelli] walking in on [the plaintiff] and that [the plaintiff] wanted [Mongelli] to announce herself."  Pl.'s Opp'n Ex. 9 at 210:5-12.  Mongelli states the plaintiff then said she was "sick of it and she was going to go to EEO right now."  *Id.* at 210:11-19.  At that point, according to Mongelli, the plaintiff stood up, pushed her chair back, and "bammed into" Mongelli, causing Mongelli to "rock[] to the side of the cubicle" while the plaintiff "barged right on out the door."  *Id.* at 212:10-14.  Mongelli states that the plaintiff did not climb over a chair to leave her cubicle and that she did not block the plaintiff's exit.  *Id.* at 215:10-19.

The plaintiff alleges that she and Mongelli exchanged words over whether Mongelli should knock before entering the plaintiff's cubicle, Pl.'s Opp'n Ex. 36 at 78:10-16, after which the plaintiff states she stood up and "said well, [she was] going to make a complaint to EEO. [She was] going to make another complaint."  *Id.* at 78:16-18.  The plaintiff alleges, Mongelli

stepped back, but did not clear a path for the plaintiff to move through the entry to her cubicle.

*Id.* at 78:18-20, causing the plaintiff to say "excuse me" and "climb[] over [her] guest chair" to

exit the cubicle. *See id.* at 78:20–79:1. At that point, the plaintiff alleges, Mongelli "went to

block [her] to prevent [her] from leaving and pushed [her], bumped into [her] and bumped [her]

into the wall." *Id.* at 79:2-5. The plaintiff asserts that she had to grab the wall to keep from

falling. *Id.* at 79:6-7. The DOJ investigator assigned to the case states that neither woman was

"physically harmed" by the incident and, due to the small size and cluttered nature of the

plaintiff's work area, "it would be difficult for the occupant to leave without touching the visitor

regardless of intent." Inv. Rep. at 3. The investigator noted that the plaintiff and Mongelli were

each "convinced that [the incident] was an intentional action on the part of the other." *Id.*

The official report of the incident from the Federal Protective Service states, based on

interviews of both Mongelli and the plaintiff, that "it has been determined that there was never

an assault that had ever occurred on either individuals [sic] part. This case is closed due to no

criminal activity." Def.'s Mot. Ex. 42 at 6, ECF No. 55-34.

The plaintiff describes this incident as "workplace violence" and alleges that her

supervisor was retaliating against her for the plaintiff's EEO activity, about which Mongelli had

recently become aware. *See* Pl.'s Opp'n Ex. 36 at 84:1-7. Specifically, the plaintiff alleges that

Mongelli became aware of her EEO activities on August 7, 2007 when a union representative

forwarded an email to Mongelli mentioning the plaintiff's activities. *See* Pl.'s Opp'n Ex. 31

(email, dated Aug. 7, 2007, between plaintiff and union representatives forwarded to Mongelli

and Suttington) at 5, ECF No. 59-31 (mentioning "discussions [the plaintiff] . . . had with EEO

(re: discrimination complaint) and Personnel (re: reasonable accommodation form and workers

comp for my hand).")[13]   The plaintiff claims that the DOJ's failure to discipline Mongelli was, at least partially, due to the plaintiff's race.  *See* Pl.'s Opp'n Ex. 3 at 208:4-25 ("[I]f the situation had been reversed, if [the plaintiff] were the one to assault [Mongelli], action would have been taken against [the plaintiff].").

### C.      The Plaintiff's EEO Complaint

The plaintiff initiated the EEO Complaint process on July 25, 2007 "by contacting the OJP's Equal Employment Opportunity ("EEO") Office."  Pl.'s SMF ¶ 32.  The complaint was apparently triggered by the July 20, 2007 memorandum in which the plaintiff was advised that she would not be granted advance sick leave and that she was not allowed to return to work until she could perform all of her duties.  Def.'s Mot. Ex. 1 at 1, ECF No. 55-1 (EEO Counselor's Report, Oct. 19, 2007, referring to July 20, 2007 memorandum requiring use of leave for remaining time period when plaintiff could not use keyboard);[14] *see supra* Part I.B.3.d.  The EEO Counselor's report describes the plaintiff's "Specific Allegation(s)" as being that "the agency discriminated against her because of her race (Black), and physical disability (Carpal Tunnel Syndrome), when she was subjected to a hostile work environment and time and attendance issues."  *Id.* at 1.  Two specific incidents were cited: the July 20, 2007 memorandum "requiring [the plaintiff] to use sick or annual leave, or to use leave without pay (LWOP) to cover absences associated with the 30-day no keyboarding restriction invoked by her physician,"

---

[13] The plaintiff cites the same email exchange as evidence of a "sarcastic[]" response by Mongelli in relation to the plaintiff's EEO complaint, quoting Suttington's question: "So, who is discriminating against [the plaintiff]?" and Mongelli's response: "All I know is what I see in the email.  I hope it's me . . . ."  Pl.'s Opp'n Mem. at 15.  The plaintiff truncates the quotation and, consequently, takes the statement out of context.  Mongelli's full response was "I hope it's me, because I am equally riding all staff about their leave and their workload so I can unequivocally state that I'm giving everyone nervous breakdowns equally."  Pl.'s Opp'n Ex. 31 at 2.

[14] The EEO Counselor's Report lists July 25, 2007 as the "Date of Initial Contact," but June 6, 2007 as the "Date of Initial Interview."  Def.'s Mot. Ex. 1 at 2.  Given that the first incident the Report refers to is the July 20, 2007 memorandum, *id.* at 1, the "June 6" date is likely a typographical error.

and the August 14, 2007 incident where the plaintiff "allege[d] that her 1st Line Supervisor bumped her while existing [sic] her cubicle." *Id.*[15]

The plaintiff completed pre-counseling efforts without reaching a resolution of her complaints, which resulted in her receiving a "Notice of Right to File a Discrimination Complaint." Pl.'s SMF ¶ 35. The plaintiff's official "Complaint of Discrimination" was received by the OJP's EEO office on October 25, 2007.[16] Pl.'s Opp'n Ex. 37 (the "EEO Complaint") at 2, ECF No. 59-35. In her EEO Complaint, the plaintiff alleges that she was denied "reasonable leave relating to asthma and occupational carpal tunnel syndrome; [d]iscriminatory distribution of work assignments; [h]ostile work environment and work place [sic] violence; and Reprisal." *Id.* Not all of the issues raised in the EEO Complaint were accepted for investigation. Pl.'s SMF ¶ 37; Def.'s Mot. Ex. 5 (Acceptance and Partial Dismissal of Complaint of Discrimination) at 2, ECF No. 55-5. The EEO office agreed to investigate the plaintiff's racial and right-hand CTS disability discrimination and retaliation claims based on the July 20, 2007 memorandum and the bumping incident. Def.'s Mot. Ex. 5 at 1. The office initially rejected any claims based on the alleged discriminatory work assignment practices because these claims were not raised with the EEO Counselor. *Id.* at 2.

The plaintiff requested reconsideration of the EEO office's decision not to investigate her work assignment claim. Pl.'s SMF ¶ 39; Def.'s Mot. Ex. 6 (Request for Reconsideration of Partial Dismissed Claim) at 2, ECF No. 55-6. The OJP EEO office granted the appeal for

---

[15] The plaintiff asserts that "the evidence shows that in [the plaintiff's] communications with the EEO counselor, she discussed not only the matters contained in the quoted segment, but also her claims of discriminatory work assignment and failure to accommodate her asthma disability." Pl.'s SMF ¶ 33. While the EEO Counselor's Report references the plaintiff's claims regarding her asthma, which are no longer at issue in this case, *see* Pl.'s Opp'n at 2 n.1, no mention is made of the plaintiff's discriminatory work assignment claims, *see generally* Def.'s Mot. Ex. 1.
[16] The Complaint of Discrimination contains, in box 10 for "Date of This Complaint," the date October 26, 2007, but the document is stamped "Received" by the OJP/EEO Office on October 25, 2007. *See* Def.'s Mot. Ex. 4 at 2, ECF No. 55-4. This discrepancy is not material to the resolution of the instant motion.

investigative purposes and added the plaintiff's "claim of racially discriminatory assignment of work," based on the August 2, 2007 reassignment of the Excess Cash Project back to the plaintiff, in light of the plaintiff's allegation that "work assignments are permanently reassigned for non African-Americans."  Pl.'s SMF. ¶ 40; Def.'s Mot. Ex. 7 (Amended Acceptance Notice of Complaint of Discrimination) at 1, ECF No. 55-7.

On April 29, 2010, the DOJ's Complaints Adjudication Office issued its Final Agency Decision ("FAD") as requested by the plaintiff.  Pl.'s SMF ¶ 43; Def.'s Mot. Ex. 11 ("FAD"), ECF No. 55-11.  The FAD denied (1) the plaintiff's discriminatory work assignment claim, without reaching the merits, because this claim was not discussed with the EEO Counselor at the informal complaint stage and was not "like or related to" the plaintiff's original complaint, FAD at 23; and (2) the plaintiff's claims based on the bumping incident and the July 20, 2007 memorandum, on the merits, upon finding that the DOJ had not engaged in discriminatory conduct, *id.* at 5–13.

### D.    Procedural History

The plaintiff filed the instant action on August 2, 2010,[17] ECF Docket Entry 1 (noting date of filing as August 2, 2010), accompanied by a motion to accept the complaint as being timely filed on July 30, 2010, *see generally* Pl.'s Mot. Accept Her Compl. As Filed On July 30, 2010, ECF No. 2.  The plaintiff mistakenly believed she could not file her complaint in the night drop box for the District Court.  *See id.* at 3.  The defendant opposed the plaintiff's motion and subsequently filed a motion to dismiss based on the untimeliness of the complaint.  *See generally* Def.'s Mot. Dismiss, ECF No. 6.  Since the plaintiff's opposition referenced material outside of the pleadings, the Court notified the parties that the defendant's motion to dismiss would be

---

[17] The case was reassigned to the undersigned Judge on January 21, 2011.

treated as a motion for summary judgment, pursuant to Federal Rule of Civil Procedure 12(d). *See* Minute Order, Aug. 9, 2011.

Following the submission of additional material in response to the Court's Order, the Court denied the defendant's motion to dismiss and granted the plaintiff's motion in part and denied it in part,[18] equitably tolling the time to file the plaintiff's complaint until August 2, 2010, making the complaint timely. *See* Order at 1, ECF No. 14; *Smith v. Holder*, 806 F. Supp. 2d 59, 64 (D.D.C. 2011).

The complaint alleges four counts: "Race Discrimination-Hostile Work Environment" under Title VII, 42 U.S.C. §§ 2000e-2(a)(1), 2000e-16, Compl. ¶¶ 240–47 (Count I); "Disability Discrimination" under the Rehabilitation Act, 29 U.S.C. § 791, Compl. ¶¶ 248–59 (Count II); Retaliation under Title VII, 42 U.S.C. § 2000e-3(a), Compl. ¶¶ 260–70 (Count III); and Retaliation under the Rehabilitation Act, 29 U.S.C. § 791, Compl. ¶¶ 271–78 (Count IV). The plaintiff seeks (1) "A declaratory judgment that the [defendant] discriminated and retaliated against plaintiff[;]" (2) reassignment to "a position elsewhere in the [DOJ] at the same grade level she now has, in which she would not need to keyboard as much as she now does[;]" (3) "reasonable accommodations for her disabilities[;]" (4) attorneys' fees under the Rehabilitation Act; (5) $300,000 in compensatory damages "for emotional distress and aggravation of her disabilities[;]" and (6) "Restoration of 251 hours of leave which the [defendant] denied plaintiff between 2007 and 2008.[19]

---

[18] The plaintiff's motion was denied insofar as it requested that the Court "accept the Complaint as timely filed on July 30, 2010," since "the Complaint was not filed on that date," *Smith v. Holder*, 806 F. Supp. 2d 59, 64 n.4 (D.D.C. 2011), and the plaintiff's alternative request for equitable tolling until August 2, 2010, that date on which the Complaint was filed, was granted, *id.* at 64.

[19] The plaintiff has withdrawn her demand for a "within-grade increase to make up for the delay of her within-grade increase in March 2008" and restoration of the plaintiff's leave and retirement computation dates. *See* Pl.'s Opp'n Mem. at 26. Although the plaintiff states she made these claims in paragraphs 244(f) and (g) of the complaint, Pl.'s Opp'n at 26, she expressly states that she is still pursuing the restoration of leave she demands in paragraph 244(f). *See id.* Thus, the Court construes the plaintiff's withdrawal as pertaining to paragraphs 244 (g), (h), and (i) of the

After the Court's ruling on the defendant's initial motion to dismiss, the parties engaged in a protracted discovery and negotiation process, including two extensions of time for the defendant to file an answer, Minute Orders, Aug. 31, 2011 and Sept. 15, 2011; three settlement conferences before a Magistrate Judge, Minute Entries, Nov. 10, 2011, Nov. 17, 2011, Nov. 30, 2011; four extensions of time to the agreed upon initial briefing schedule for dispositive motions, *see* Minute Orders Dec. 23, 2011, Jan. 10, 2012, Jan. 23, 2012, Feb. 7, 2012; five extensions of the deadline for discovery, *see* Minute Orders Mar. 16, 2012, May 30, 2012, Aug. 31, 2012, Nov. 5, 2012, Dec. 5, 2012; a referral for alternative dispute resolution, Minute Order, Mar. 8, 2013; and another extension of time to file responses to renewed dispositive motions, Minute Order, June 7, 2013.  The Court also allowed the parties to clarify their positions regarding the alleged retaliatory acts on which Counts III and IV are based.  Minute Order, Mar. 31, 2014.  In total, the parties engaged in well over a full year of discovery in addition to two separate attempts at settlement and mediation.  The parties' submissions on the instant motion include ninety exhibits, totaling over 1,200 pages, all of which have been carefully reviewed by the Court.

## II.     APPLICABLE LEGAL STANDARDS

### A.     Summary Judgment

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Summary judgment is properly granted against a party who, "after adequate time for discovery and upon motion, . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case,

---

complaint, which all refer to automatic changes to the plaintiff's salary and service computation dates made "without any affirmative decision, racial or otherwise" by the defendant, pursuant to the plaintiff's memorandum in opposition. *See id.*

and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The burden is on the moving party to demonstrate that there is an "absence of a genuine issue of material fact" in dispute.  *Id*. at 323.[20]

In ruling on a motion for summary judgment, the Court must draw all justifiable inferences in favor of the nonmoving party and shall accept the nonmoving party's evidence as true.  *Anderson v. Liberty Lobby, Inc*. ("*Liberty Lobby*"), 477 U.S. 242, 255 (1986).  The Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record."  FED. R. CIV. P. 56(c)(3).  For a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993); *accord* FED. R. CIV. P. 56(e).  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor.  *See, e.g.*, FED. R. CIV. P. 56(c)(1); *Equal Rights Ctr. v. Post Props.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011) (noting that at summary judgment stage, plaintiff "can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' . . . which for purposes of the summary judgment motion will be taken to be true.'" (quoting *Sierra Club v. EPA*, 292 F.3d 895, 898– 99  (D.C. Cir. 2002)) (ellipsis and alterations in original)).  "If the evidence is merely colorable,

---

[20] When, as here, the defendant expressly moves for summary judgment in the alternative to a motion to dismiss and relies upon extra-pleading material, to which the plaintiff has an opportunity to respond, the Court may treat the motion as one for summary judgment without issuing a prior notice of converting the motion to dismiss into a motion for summary judgment, as otherwise required by Federal Rule of Civil Procedure 12(d). *See Colbert v. Potter*, 471 F.3d 158, 168 (D.C. Cir. 2006); *see also Mount v. Johnson*, 36 F. Supp. 3d 74, 81–82 (D.D.C. 2014); *Pintro v. Wheeler*, 35 F. Supp. 3d 47, 52 n.5 (D.D.C. 2014) (finding prior notice of conversion unnecessary "where the plaintiff is represented by counsel and has responded to the submission of exhibits with evidence of her own."); *Hamilton v. Geithner*, 743 F. Supp. 2d 1, 8 (D.D.C. 2010), *rev'd in part on other grounds*, 666 F.3d 1344 (D.C. Cir. 2012).

or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (citations omitted).

"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.  In that situation, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.*  Notably, "[s]elf-serving testimony does not create genuine issues of material fact, especially where that very testimony suggests that corroborating evidence should be readily available." *Fields v. Office of Johnson*, 520 F. Supp. 2d 101, 105 (D.D.C. 2007).  Additionally, "on summary judgment, statements that are impermissible hearsay or that are not based on personal knowledge are precluded from consideration by the Court." *Riggsbee v. Diversity Servs., Inc.*, 637 F. Supp. 2d 39, 46 (D.D.C. 2009); *accord* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *see also Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (holding that "[v]erdicts cannot rest on inadmissible evidence" and "sheer hearsay . . . therefore counts for nothing" at summary judgment).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury," however, "is as much art as science." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011).  Particularly in a case such as this where the non-moving party relies almost entirely upon her own generally uncorroborated statements in depositions, declarations, and interrogatory responses to create a genuine issue of material fact, the Court must carefully

assess whether the plaintiff's evidence is "merely colorable," *Liberty Lobby*, 477 U.S. at 249, or whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *id*. at 248.  The Court must review the record "taken as a whole."  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000).  The Court must accept all of the non-movant's evidence as true and give her the benefit of all justifiable inferences. *See id*. at 255. The Court "may not make credibility determinations or weigh the evidence," *Reeves*, 530 U.S. at 150, as "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Id.* (quoting *Liberty Lobby*, 477 U.S. at 255).  Nevertheless, a non-movant's allegations that "are generalized, conclusory and uncorroborated by any evidence other than the [non-movant's] own deposition testimony" are "insufficient to establish a triable issue of fact"—at least where the nature of the purported factual dispute reasonably suggests that corroborating evidence should be available. *Akridge v. Gallaudet Univ.*, 729 F. Supp. 2d 172, 183 (D.D.C. 2010); *see also GE v. Jackson*, 595 F. Supp. 2d 8, 36 (D.D.C. 2009) (observing that when a "declaration is self-serving and uncorroborated" it is "of little value at the summary judgment stage").

**B.      Title VII Discrimination Claims**

Title VII of the Civil Rights Act makes it unlawful for an employer to discriminate against any individual "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).  Under Title VII, "the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, [or] national origin."  *Baloch v. Kempthorne,* 550 F.3d 1191, 1196 (D.C. Cir. 2008); *accord Brady v. Office of the Sergeant at Arms,* 520 F.3d 490, 493 (D.C. Cir. 2008).  An "adverse employment action" is "'a significant change in employment status,

such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'"  *Baird v. Gotbaum,* 662 F.3d 1246, 1248 (D.C. Cir. 2011) (quoting *Douglas v. Donovan,* 559 F.3d 549, 552 (D.C. Cir. 2009)); *see also Stewart v. Ashcroft,* 352 F.3d 422, 426 (D.C. Cir. 2003) ("An [a]dverse employment action . . . [entails a] tangible employment action evidenced by firing, failing to promote, a considerable change in benefits, or reassignment with significantly different responsibilities.").  An adverse employment action occurs if an employee "experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm."  *Forkkio v. Powell,* 306 F.3d 1127, 1131 (D.C. Cir. 2002).

The Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973), set forth a burden-shifting framework to apply in Title VII cases.  Under this framework, once the plaintiff has established a *prima facie* case under Title VII, "the burden of production shifts to the employer to produce a 'legitimate, nondiscriminatory reason' for its action."  *Solomon v. Vilsack*, 763 F.3d 1, 14 (D.C. Cir. 2014) (quoting *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007)); *see also Hernandez v. Pritzker*, 741 F.3d 129, 133 (D.C. Cir. 2013); *Youssef v. FBI,* 687 F.3d 397, 402 (D.C. Cir. 2012).  Under the *McDonnell Douglas* burden-shifting framework, "the burden shifts to the employer to articulate 'some legitimate, nondiscriminatory reason' for the employment action, which the plaintiff can rebut by proving, under a preponderance of the evidence standard, that the employer's justification is merely pretext for discrimination."  *Brown v. Sessoms*, 774 F.3d 1016, 1022–23 (D.C. Cir. 2014); *see also Jones v. Bernanke,* 557 F.3d 670, 678 (D.C. Cir. 2009).  In other words, once an employer produces a legitimate, nondiscriminatory reason for its action, "'the sole remaining issue [is] discrimination . . . *vel*

*non*.'" *Kersey v. Wash. Met. Area Transit Auth.*, 586 F.3d 13, 17 (D.C. Cir. 2009) (quoting

*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000)) (first alteration in

original).

### C.    Rehabilitation Act Claims

"[T]he Rehabilitation Act prohibits federal agencies from engaging in employment

discrimination against disabled individuals and further requires agencies to make reasonable

accommodations for persons with disabilities unless such accommodations would impose undue

hardship on the agency." *Klute v. Shinseki*, 840 F. Supp. 2d 209, 215 (D.D.C. 2012) (quoting

*Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 82 (D.D.C. 2009)).  "To determine the appropriate

reasonable accommodation, the agency should 'initiate an informal, interactive process with the

qualified individual with a disability in need of accommodation.'" *Loya v. Sebelius*, 840 F.

Supp. 2d 245, 258 (D.D.C. 2012) (quoting 29 C.F.R. § 1630.2(o)(3)).  "'[A]n employer is not

required to provide an employee that accommodation [s]he requests or prefers, the employer

need only provide some reasonable accommodation.'" *Id.*  (quoting *Aka v. Wash. Hosp. Ctr.*,

156 F.3d 1284, 1305 (D.C. Cir. 1998) (en banc)) (alteration in original).

To survive summary judgment on a Rehabilitation Act claim, a plaintiff must "come

forward with sufficient evidence to allow a reasonable jury to conclude that" she meets four

elements: "(i) she was disabled within the meaning of the Rehabilitation Act; (ii) her employer

had notice of her disability; (iii) she was able to perform the essential functions of her job with or

without reasonable accommodation; and (iv) her employer denied her request for a reasonable

accommodation of that disability." *Solomon*, 763 F.3d at 9 (internal citations omitted).

"An individual is disabled [within the meaning of the Rehabilitation Act] if [s]he: (1) has

'a physical or mental impairment that substantially limits one or more of [her] major life

activities,' (2) has 'a record of such impairment,' or (3) has been 'regarded as having such an impairment.'" *Klute*, 840 F. Supp. 2d at 215 (quoting 42 U.S.C. § 12102(1)); *see also* 29 U.S.C. § 705(20)(B) (incorporating into the Rehabilitation Act the Americans with Disabilities Act's ("ADA") definition of disabled individual).  To be substantially limiting, "an 'impairment's impact must . . . be permanent or long term.'"  *Klute*, 840 F. Supp. 2d at 216 (quoting *Haynes v. Williams*, 392 F.3d 478, 482 (D.C. Cir. 2004)).

### D.      Title VII Retaliation Claims

"Title VII's anti-retaliation provision makes it unlawful for an employer 'to discriminate against [an] employee . . . because he has opposed any practice' made unlawful by Title VII or 'has made a charge, testified, assisted, or participated in' a Title VII proceeding." *Steele v. Schafer*, 535 F.3d 689, 695 (D.C. Cir. 2008) (quoting 42 U.S.C. § 2000e–3(a)).  The Court assesses Title VII retaliation claims under the *McDonnell Douglas* burden-shifting framework. *See supra* Part II.B.  First, the plaintiff must prove a *prima facie* case of retaliation by showing: "(1) [s]he engaged in protected activity; (2) [s]he was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action." *Hamilton*, 666 F.3d at 1357 (internal quotation marks and citation omitted).  If the *prima facie* case is made, the defendant must establish that the adverse employment action was "taken for a legitimate, nondiscriminatory reason." *Youssef,* 687 F.3d at 402 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)).  The Court then determines "whether a reasonable jury 'could infer discrimination'" from the plaintiff's pleadings, the defendant's proffered explanation, and any further rebuttal evidence or evidence of discrimination provided by the plaintiff. *Vickers v. Powell,* 493 F.3d 186, 195 (quoting *Aka,* 156 F.3d at 1289).

As to the first element, protected activity encompasses utilizing informal grievance procedures such as complaining to management or human resources about the discriminatory conduct. *Richardson v. Gutierrez,* 477 F. Supp. 2d 22, 27 (D.D.C. 2007) ("It is well settled that Title VII protects informal, as well as formal, complaints of discrimination."); *see also Bell v. Gonzales,* 398 F. Supp. 2d 78, 94 (D.D.C. 2005) ("Initiation of EEO counseling to explore whether an employee has a basis for alleging discrimination constitutes protected activity, even in the absence of an unequivocal allegation of discrimination.").

A plaintiff meets the second element to show a *prima facie* case of retaliation if "a reasonable employee would have found the challenged action materially adverse," meaning that it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co. v. White* (*Burlington Northern*), 548 U.S. 53, 68 (2006) (internal quotations and citations omitted). Thus, adverse actions giving rise to retaliation claims are broader than for disparate impact claims and "are 'not limited to discriminatory actions that affect the terms and conditions of employment." *Baird,* 662 F.3d at 1249 (quoting *Burlington Northern,* 548 U.S. at 64). Yet, the Court in *Burlington Northern* distinguished "materially adverse" actions from "trivial harms," "petty slights," and "minor annoyances." *Burlington Northern*, 548 U.S. at 68. The Court also noted that "[c]ontext matters" and "the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 69; *see also id.* ("[A]n act that would be immaterial in some situations is material in others.") (internal quotation marks and citation omitted).

Finally, the third element of the test requiring a causal link between the protected activity and the adverse employment action requires "proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct.

2517, 2528 (2013).  In other words, "traditional principles of but-for causation" apply and the plaintiff must show "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Id.* at 2533.

Significantly, however, even if the plaintiff establishes a *prima facie* case of retaliation, dismissal may still be warranted if the defendant shows a legitimate non-discriminatory reason for its actions.  *See Broderick v. Donaldson,* 437 F.3d 1226, 1231–32 (D.C. Cir. 2006).  Such a legitimate reason breaks the causal connection between the first two elements and defeats a retaliation claim.  Then "the 'central question' in [the] case is whether [the plaintiff] has produced sufficient evidence for a reasonable jury to find those reasons were but pretexts for retaliation."  *Hernandez v. Pritzker*, 741 F.3d 129, 133 (D.C. Cir. 2013); *see also McGrath v. Clinton,* 666 F.3d 1377, 1383 (D.C. Cir. 2012).

### E.        Exhaustion of Administrative Remedies

A plaintiff may file a Title VII or Rehabilitation Act action in federal court only after exhausting her administrative remedies before the relevant federal agency for each allegedly discriminatory act.  *See Payne v. Salazar,* 619 F.3d 56, 65 (D.C. Cir. 2010) (Title VII); *Barkley v. U.S. Marshals Serv. ex rel. Hylton*, 766 F.3d 25, 34–35 (D.C. Cir. 2014) (Rehabilitation Act, citing *Spinelli v. Goss,* 446 F.3d 159, 162 (D.C. Cir. 2006)).  Under the Rehabilitation Act, a failure to exhaust administrative remedies is a jurisdictional defect, requiring dismissal for lack of subject-matter jurisdiction under Rule 12(b)(1).  *See Spinelli*, 446 F.3d at 162 (remanding case since "[t]he district court also should have dismissed [the plaintiff's] Rehabilitation Act claim for lack of jurisdiction on the ground that he failed to exhaust his administrative remedy," citing statutory language as "mandating administrative exhaustion"); *see also Barkley*, 766 F.3d at 34-35 (D.C. Cir. 2014) (noting *Spinelli's* holding "that a district court lacks jurisdiction over a

Rehabilitation  Act claim if "there was no administrative complaint [filed] and thus no final disposition of one." (alteration in original)).  Since exhaustion of Rehabilitation Act claims "is a jurisdictional requirement," the plaintiff has the burden to plead and prove it.  *Dick v. Holder*, No. 13-1060, 2015 WL 691189, at *4 (D.D.C. Feb. 19, 2015).[21]

By contrast, "Title VII's exhaustion requirements are not jurisdictional."  *Artis v. Bernanke*, 630 F.3d 1031, 1034 n.4 (D.C. Cir. 2011) (citations omitted).  "Accordingly, a 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted is the appropriate vehicle to challenge an alleged failure to exhaust administrative remedies under Title VII."  *Mahoney v. Donovan*, 824 F. Supp. 2d 49, 58 (D.D.C. 2011) (internal quotation marks and citations omitted).  "Because untimely exhaustion of administrative remedies is an affirmative defense, the defendant bears the burden of pleading and proving it."  *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997) (citation omitted).  "In other words, odd as it may seem, Defendants carry the burden of proof under Title VII while Plaintiff bears that burden under the Rehabilitation Act."  *Mahoney*, 824 F. Supp. 2d at 58.

The procedures governing administrative processing of discrimination complaints brought by employees of the federal government under the Title VII and the Rehabilitation Act are set forth in 29 C.F.R. Part 1614 (Federal Sector Equal Employment Opportunity).  *See* 29 C.F.R. § 1614.105.  These regulations require an employee to "consult a[n EEOC] Counselor prior to filing a complaint in order to try to informally resolve the matter."  *Id*. § 1614.105(a).

---

[21] Another Judge in this District has noted that "*Spinelli*'s holding that exhaustion is jurisdictional under the Rehabilitation Act comes into tension with the Supreme Court's decision in *Arbaugh*, which explained that without a clear statement in the statute labeling a limitation as jurisdictional, courts should presume that such limitation is not jurisdictional."  *Dick*, 2015 WL 691189, at *4 n.8 (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 515–16 (2006)).  The *Dick* Court concluded, however, that "because *Spinelli* was decided in May 2006, after *Arbaugh* was issued in February 2006, and because it has not been withdrawn or overruled, this Court is still bound by its holding that exhaustion is jurisdictional under the Rehabilitation Act."  *Id.* (citing *Cobell v. Salazar*, 816 F. Supp. 2d 10, 15 (D.D.C. 2011)).  This Court is similarly bound.

"An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory . . . ." *Id*. § 1614.105(a)(1).

If the matter is not resolved through informal counseling, the aggrieved employee must, within 15 days of receiving a notice of her right to file a discrimination complaint, file a written complaint with the agency that allegedly discriminated against her. *See id*. § 1614.106(a)-(c). The agency must investigate the matter within 180 days or reject the complaint and issue a final dismissal unless "the parties agree in writing to extend the time period." *Id*. §§ 1614.106(e)(2), 1614.107. At the conclusion of the agency's investigation, the complainant may request a hearing before an EEOC administrative judge or an immediate final decision by the agency. *See id*. § 1614.108(f).

A complainant who receives an adverse final decision from the agency may appeal that decision to the EEOC within 30 days, or may file a civil action within 90 days. *See* 42 U.S.C. § 2000e-16(c); 29 C.F.R. §§ 1614.402(a)-1614.407; *see also Wilson v. Pena*, 79 F.3d 154, 157 (D.C. Cir. 1996); *Holley v. Dep't of Veterans Affairs*, 165 F.3d 244, 245–46 (3d Cir. 1999). A complainant also may file a civil action at any time after a complaint has been pending before the agency or the EEOC for at least 180 days. *See* 42 U.S.C. 2000e-16(c); 29 C.F.R. § 1614.408.

"Complainants must timely exhaust these administrative remedies before bringing their claims to court." *Bowden*, 106 F.3d at 437. As the U.S. Supreme Court stated in *National Railroad Passenger Corp. v. Morgan*, "'strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.'" 536 U.S. 101, 108 (2002) (quoting *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980)).

## III.    DISCUSSION

The four claims in the Complaint will be considered based on the underlying discrimination claimed.  Thus, Counts I and III, alleging racial discrimination and retaliation in violation of Title VII, will be discussed separately from Counts II and IV, alleging disability discrimination and retaliation in violation of the Rehabilitation Act.  The plaintiff's Rehabilitation Act claims fail based on the threshold finding that the plaintiff was not disabled within the meaning of the Act and the plaintiff otherwise failed to exhaust her administrative remedies as to those claims.  Those two counts are addressed first before turning to the Title VII counts.

### A.    Rehabilitation Act Claims

The plaintiff cannot sustain her Rehabilitation Act claims in Counts II and IV because the plaintiff was not disabled within the meaning of the Rehabilitation Act in effect at the time the allegedly discriminatory actions occurred.  As discussed more fully below, the applicable definition of "disabled" is too narrow to cover the plaintiff's right-hand CTS.  Furthermore, to the extent that the plaintiff bases her Rehabilitation Act claims on events occurring after January 1, 2009, those allegations were not administratively exhausted, thus depriving this Court of subject matter jurisdiction.

### 1.    The Pre-2009 Definition Of "Disabled" Applies To This Action

The threshold determination for any action under the Rehabilitation Act is whether the individual making a claim is "disabled" within the meaning of the statute.  *See, e.g.*, *Bell*, 398 F. Supp. 2d at 85 ("[A] key element is establishment of a disability covered by the Act.").  The defendant challenges the plaintiff's Rehabilitation Act claims at the outset by arguing she is not "disabled" within the meaning of the Act.  *See* Def.'s Mem. at 29; Def.'s Reply at 9.  The Court agrees with the defendant.

As the plaintiff notes, what constitutes a "disability" under the Rehabilitation Act changed on January 1, 2009, when Congressional amendments to the ADA went into effect.[22] *See* Pl.'s Resp. Court Order ("Pl.'s Resp.") at 5 n.5, ECF No. 65 (citing Pub. Law No. 110-325, 122 Stat. 3553 (2008) ("the ADA Amendments")).  The ADA Amendments "reinstat[ed] a broad scope of protection under the ADA and [rejected] the holdings in" two Supreme Court cases, namely, *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams* (*Toyota*), 534 U.S. 184, 195–96 (2002), and *Sutton v. United Airlines*, 527 U.S. 471 (1999).  *Lytes v. D.C. Water & Sewer Auth.*, 572 F.3d 936, 939 (D.C. Cir. 2009).  The D.C. Circuit has made clear that these amendments "do not apply retroactively."  *Id.* at 938.

The plaintiff argues that "when, as here, some of the alleged disability discrimination occurred after January 1, 2009," the amended, broader definition applies.  *See* Pl.'s Resp. at 5 n.5 (citing *Hodges v. District of Columbia*, 959 F. Supp. 2d 148, 154 (D.D.C. 2013)).  The plaintiff's reliance on *Hodges* for this proposition is misplaced.  In *Hodges*, the plaintiff's disability issues did not begin to occur until "early 2010" and the plaintiff's disability was not diagnosed until June 2010, more than one year after the ADA Amendments took effect.  *See Hodges*, 959 F. Supp. 2d at 150–51.  Contrary to the plaintiff's assertion, *Hodges* does not address the question of whether the pre- or post-ADA Amendments definition applies to an employee's claim when the discrimination allegedly began before 2009 and continued after 2009.  *See id.*  Rather, *Hodges* holds that the new definition applies to a claim that arose *entirely* after the ADA amendments became effective.  *See id.* at 154.

This Circuit does not appear to have addressed the factual circumstance at issue here: where a plaintiff claims an ongoing hostile work environment based on her alleged disability that

---

[22] The definition of "disability" contained in the ADA amendments also applies to the Rehabilitation Act.  *See* 29 U.S.C. § 705(9)(B) (stating "disability" is given same meaning as in 42 U.S.C. § 12102 of ADA).

began before, and continued after, the ADA Amendments took effect.  Nor have the parties

provided any such citations to the Court.  The court in *Klute*, was faced with a similar factual

situation, but found it unnecessary to reach the issue because the plaintiff in that case did not

meet the definition of disability applicable under the pre- or post-2009 standard.  840 F. Supp. 2d

at 215 n.4.

The Court finds that the pre-2009 definitional standard applies to the vast majority of

conduct alleged in this matter.  In *Kapache v. Holder*, 677 F.3d 454, 461 n.7 (D.C. Cir. 2012),

the D.C. Circuit noted that because "the conduct at issue preceded the ADA Amendments Act of

2008, the pre-amendment standards to determine liability govern []."  The *Kapache* court relied

on *Lytes* for this proposition, *see id.*, and the rationale explained in *Lytes* militates in favor of

using the earlier, more stringent standard to evaluate the defendant's actions in this matter.  *See*

*Lytes*, 572 F.3d at 940.  In *Lytes*, when considering whether the ADA Amendments were to be

applied retroactively, the Court placed great weight on the fact that Congress "delay[ed] the

effective date of the statute" and therefore "mandated purely prospective application of the

[ADA Amendments]."  *Id.*  The D.C. Circuit concluded that there was "no reason for the

Congress to have delayed the effective date [of the ADA Amendments] other than to give fair

warning of the Amendments to affected parties and to protect settled expectations."  *Id.*

Applying this same logic to the instant matter, the defendant had no "fair warning," prior

to January 1, 2009, that the more lenient standard under the ADA Amendments would apply to

conduct that occurred in 2008 and earlier.  This is significant since the amendments "broadened

the class of employees entitled to reasonable accommodation."  *Id.* at 942.  Here, as the D.C.

Circuit found in *Lytes*, "[t]o hold the [agency's] refusal to accommodate [the plaintiff] was

unlawful under the new, broader [ADA Amendments] but not the pre-Amendments ADA,

therefore, would be to give the [ADA Amendments] the disfavored retroactive effect." *Id.*

(citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994)).  The defendant in this matter

was subject, in 2007 and 2008, to the requirements of the ADA (through the Rehabilitation Act)

as they then existed.  Thus, the pre-2009 definition of "disability" applies to the alleged conduct

that occurred prior to January 1, 2009.

### 2. *The Plaintiff Was Not Disabled Within The Meaning Of The Rehabilitation Act Until January 1, 2009*

Prior to the ADA Amendments, "disability" was defined as "a physical or mental

impairment that substantially limits one or more of the major life activities of [an] individual,"

having "a record of such impairment," or "being regarded as having such impairment."  Pub L.

101-336 § 3(2), 104 Stat. 329 (1990).  The defendant does not dispute that the plaintiff's right-

hand CTS constitutes a "physical impairment."  *See* Def.'s Mem. at 29.  Rather, the defendant

disputes whether, under the pre-2009 version of the Rehabilitation Act, the plaintiff's right hand

CTS "substantially limited" her "in any major life activity."  *Id.*

Much of the plaintiff's argument on this point is directed toward whether the defendant

provided reasonable accommodations for her medical condition.  *See* Pl.'s Opp'n Mem. at 34–

40.  In doing so, the plaintiff places the proverbial cart before the horse.  "To withstand summary

judgment on [a] disability discrimination claim, [the plaintiff] must produce enough evidence to

allow a reasonable jury to conclude that [the plaintiff] (1) *has a disability*; (2) was qualified to

perform the essential functions of employment with or without reasonable accommodation; and

(3) suffered an adverse employment decision due to [the plaintiff's] disability."  *Desmond v.*

*Mukasey*, 530 F.3d 944, 952 (D.C. Cir. 2008) (citing *Duncan v. WMATA*, 240 F.3d 1110, 1114

(D.C. Cir. 2001) (en banc)) (emphasis added).  If the plaintiff cannot establish that she had a

disability within the meaning of the Rehabilitation Act, the defendant had no obligation to

provide any accommodation and the plaintiff has no claim for relief under the Rehabilitation Act. *See id.*

The pre-Amendments ADA created "a demanding standard for qualifying as disabled." *Toyota*, 534 U.S. at 197.  The plaintiff contends that she meets this "demanding standard" because she was substantially limited in major life activities, beginning in March 2007, when she was significantly impaired from "working, keyboarding, driving, lifting, and caring for herself." Pl.'s Opp'n Mem. at 34.  In *Toyota*, which narrowly defined disability under the pre-Amendments ADA and served as an impetus for the ADA Amendments, *see Lytes*, 572 F.3d at 939, the Supreme Court held that when a physical impairment is alleged that pertains to "performing manual tasks," such as those described by the plaintiff, "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives."  534 U.S. at 198.  The plaintiff in *Toyota* suffered from CTS, among other maladies, which made completing her work in an automobile plant quite painful and resulted in her being placed on "modified duty jobs."  *Id.* at 188.  The Supreme Court held that the plaintiff's CTS, tendinitis, and other medical problems did not constitute a "disability" within the meaning of the pre-Amendments ADA, since the plaintiff was still able to "brush her teeth, wash her face, bathe, tend her flower garden, fix breakfast, do laundry, and pick up around the house."  *Id.* at 202.  Even the fact that the plaintiff in *Toyota* had "to avoid sweeping, [] quit dancing, [] occasionally seek help dressing, [] and [] reduce how often she play[ed] with her children, garden[ed], and [drove] long distances," did not, in the Supreme Court's view, "amount to such severe restrictions in the activities that are of central importance to most people's daily lives" so as to "establish a manual task disability as a matter of law."  *Id.*

In the instant matter, the plaintiff was able to "keyboard" up to four hours per day, Pl.'s SMF ¶ 16, and the plaintiff has failed to submit any evidence that she was unable to perform "the activities that are of central importance to most people's daily lives," *Toyota*, 534 U.S. at 202. The plaintiff alleges in her Complaint that her symptoms "significantly impaired some of her major life activities, including working, keyboarding, driving, lifting, and caring for herself," Compl. ¶ 255, but provides no further evidence after more than a year of discovery to substantiate those claims.  As the defendant points out, Def.'s Reply at 12, the plaintiff stated in her deposition that she was able to drive herself to doctor's appointments, Def.'s Mot. Ex. 12 147:5-7; care for herself despite living alone, *id.* 146:23–147:4; turn pages with her left hand, *id.* 142:5-15; bathe, "get in and out of bed," "answer the telephone," and "answer the door," *id.* 140:14-21; and cook, though the plaintiff avers she was able to cook "with difficulty," *id.* 140: 8-13.  Unlike the plaintiff in *Toyota*, who was entirely unable to perform certain activities, both at work and at home, *see Toyota*, 534 U.S. at 202, the plaintiff in the instant matter may have experienced discomfort due to the CTS in her right hand, but was still able to complete most of her daily tasks, at work and at home, *see* Def.'s Mot. Ex. 12 140:1–147:7.

Proving that the plaintiff was disabled within the meaning of the Rehabilitation Act in effect at the time the plaintiff's claim arose is "an essential element of [the plaintiff's] case," and the lack of colorable proof of this element "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.  The plaintiff has admitted she could perform the types of tasks that "are of central importance to most people's daily lives," *Toyota*, 534 U.S. at 202, and she has offered no evidence that her physical impairment from right-hand CTS meets the "demanding standard for qualifying as disabled" within the meaning of the Rehabilitation Act.  *See Toyota*, 534 U.S. at 197.  Consequently, since the plaintiff fails to fulfill this threshold requirement, the

plaintiff's Rehabilitation Act claims must fail, at least as to all events complained of that occurred prior to January 1, 2009, when the ADA Amendments went into effect.

As for any events post-2008, the plaintiff makes no reference to any events occurring after January 2009 in Count II or Count IV, the counts raising Rehabilitation Act claims. *See* Compl. ¶¶ 248–59; 271–78. Indeed, the only reference in her Complaint to any post-2008 events are contained in paragraphs 224 through 239 of the Complaint, but the conduct complained of in those paragraphs is discrete from the issues raised in her 2007 EEO Complaint, which was limited to the July 2007 memorandum requiring the plaintiff to use leave until she was able to return to duty and the August 2007 bumping incident. *See* Compl. ¶¶ 224–39 (alleging the defendant "neglected to honor plaintiff's medical restrictions[;]" rejected those medical restrictions after the Department of Labor ruled the plaintiff was "not entitled to workers' compensation[;]" required to the plaintiff to return to full duty; and allegedly "harassed plaintiff by looking through her personal hard drive at work in order to access her private documents that may relate to her EEO activities"). Notably, the plaintiff does not plead, nor has she submitted any evidence after discovery, that she made any attempt to pursue, administratively, any Rehabilitation Act claims based on events occurring in 2009 through the appropriate EEO channels. *See* Compl. ¶¶ 224–39.

The plaintiff alleges that her CTS became "bilateral" at some point in time, so that she suffered from this condition not only in her right hand but also simultaneously in both hands. Pl.'s Opp'n Mem. at 33. She does not allege, however, that she ever sought a reasonable accommodation or initiated an EEO process for CTS in her left hand, as opposed to her right hand, which was the subject of her 2007 complaint, let alone both hands simultaneously.[23]  To

---

[23] The plaintiff notes that she "received a letter" from the Department of Labor "accepting her [workers' compensation] claim for <u>left</u> hand carpal tunnel syndrome" in March 2010. Compl. ¶ 236 (emphasis in original).

the contrary, the plaintiff concedes that "[o]n or about November 9, 2009, [the defendant] sent plaintiff a memorandum rejecting her doctor's medical restrictions" in light of a Department of Labor Office of Workers' Compensation finding that she was not entitled to benefits for her right-hand CTS and should be capable of returning to full duty without restriction. *See* Compl. ¶ 229. The defendant's action denying any further reasonable accommodation, therefore, was based on an independent agency's determination that the plaintiff was *not* disabled and could return to full duty. *See* Compl. ¶ 227. The plaintiff does not allege that she attempted to pursue her reasonable accommodation claim after she received the November 2009 memorandum from Merkle denying any further accommodations based on the Department of Labor's findings. *See id.* ¶¶ 229–37 (alleging that defendant "failed to provide full reasonable accommodations" but providing no further information about what such accommodations were and when they were requested). Thus, even assuming, *arguendo*, that the plaintiff could prove she were disabled within the meaning of the ADA Amendments, she has not shown that she administratively exhausted any post-2008 claims or that she attempted to seek reasonable accommodations after January 1, 2009, for the left hand or both hands, at which point the agency would have been on notice that it might have been required to offer reasonable accommodation under the new definition of "disability" found in the ADA Amendments. *See supra* Part III.A.1.

Consequently, since the plaintiff fails to prove that she was disabled within the meaning of the Rehabilitation Act before January 1, 2009, and she fails to present any evidence that she exhausted her administrative remedies for any conduct that occurred after January 1, 2009, Counts II and IV must be dismissed in their entirety. Thus, the defendant's motion for Summary Judgment is granted as to all Rehabilitation Act claims.[24]

---

[24] The defendant moved to dismiss this action under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for Summary Judgment under Rule 56. Def.'s Mot. at 1. Since the plaintiff failed to exhaust her administrative

### B.      Title VII Claims

The plaintiff's Title VII claims, contained in Counts I and III of the Complaint, are

sparsely pleaded, since the Complaint primarily describes conduct related to the plaintiff's right-

hand CTS.  *See generally* Compl.  Each Title VII count is discussed separately below.

### 1.      *Count I "Race Discrimination – Hostile Work Environment"*

A plaintiff may prevail on a hostile work environment claim if she can show that her

"employer subjected [her] to 'discriminatory intimidation, ridicule, and insult' that is

'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

abusive working environment.'"  *Baloch*, 550 F.3d at 1201 (D.C. Cir. 2008) (quoting *Harris v.*

*Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  "To determine whether a hostile work environment

exists, the court looks to the totality of the circumstances, including the frequency of the

discriminatory conduct, its severity, its offensiveness, and whether it interferes with an

employee's work performance."  *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–

88 (1998)).  Title VII is not meant to be "a general civility code," but rather to protect against

"conduct [so] extreme [as] to amount to a change in the terms and conditions of employment."

*Faragher*, 524 U.S. at 788.

The plaintiff has not alleged the use of racially discriminatory comments or other overt

acts of racism in her workplace, either in her Complaint or in the extensive exhibits she

submitted.  Instead, she appears to base her entire racial discrimination claim and, hence, her

---

remedies as to any post-2008 conduct, this Court lacks subject matter jurisdiction over that portion of her
Rehabilitation Act claims.  *See Spinelli*, 446 F.3d at 162.  Thus, the appropriate rule under which to dismiss these
claims is Federal Rule of Civil Procedure 12(b)(1).  *See id.*; *Ellison v. Napolitano*, 901 F. Supp. 2d 118, 124 (D.D.C.
2012).  Although the defendant did not seek dismissal under Rule 12(b)(1), the Court has an independent obligation
to dismiss claims over which it has no subject matter jurisdiction.  *See* FED. R. CIV. P. 12(h)(3).  The portion of the
plaintiff's Rehabilitation Act claims involving post-2008 conduct is therefore dismissed pursuant to Rule 12(h)(3),
since the Court lacks subject matter jurisdiction over those claims absent the plaintiff's exhaustion of administrative
remedies.

hostile work environment claim, on her perception of differential treatment of her and non-African American employees, particularly Lynch, an Asian-American.  At the summary judgment stage, these vague and unsubstantiated assertions are insufficient to bring a case to trial.

Specifically, the plaintiff alleges that (1) Lynch was held to a different standard regarding work assignments than the plaintiff; *supra* Part I.B.1–2; (2) African Americans were denied advance sick leave more often than non-African Americans, *supra* Part I.B.3.e; (3) she was charged leave for late arrivals while non-African Americans were not, *supra* Part I.B.4; and (4) she was allegedly assaulted by Mongelli on August 14, 2007, *supra* Part I.B.5.

> a)      *Discriminatory Work Assignments*

First, the plaintiff alleges that the defendant "engaged in race discrimination by treating Plaintiff differently from Wendy Lynch (Asian) by expecting more from Plaintiff when she returned from her medical absence than from Ms. Lynch when she returned from hers."  Pl.'s Opp'n Mem. at 27.  The plaintiff contends that she was held responsible for completing a project she was assigned before her medical leave, the Excess Cash Project, but Lynch was not.  *Id.*  As evidence for this contention, the plaintiff cites only her own deposition and statements and no documentary evidence or first-hand knowledge.  *See id.* at 27–28.  The defendant, however, provides deposition testimony from Lynch's direct supervisor who assigned her the project, Mongelli, who states that Lynch "finished [the projects] before she left . . . . [s]he came in on the weekend before."  Def.'s Mot. Ex. 16 192:3-7.  Although the Court may not make credibility determinations on a summary judgment motion, it also need not accept unsupported allegations in the face of directly contrary testimony from individuals with first-hand knowledge of the relevant facts.  *See Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (noting that plaintiff's own statement amounting to "sheer hearsay . . . counts for nothing on summary

judgment") (citing *Gleklen*, 199 F.3d at 1369); *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 53 F. Supp. 3d 191, 201 (D.D.C. 2014) (rejecting inadmissible evidence from consideration in ruling on summary judgment motion); *Grosdidier v. Chairman, Boradcasting Bd. of Governors*, 774 F. Supp. 2d 76, 94 (D.D.C. 2011) (same). The plaintiff has failed to show, by means of admissible evidence, that the defendant treated Lynch any differently than the plaintiff, meaning this conduct cannot constitute part of a hostile work environment based on race.[25]

b)     *Denial Of Advance Sick Leave*

The plaintiff's contention that non-African Americans were not denied advance sick leave is similarly flawed and based on "inadmissible hearsay." *Greer*, 505 F.3d at 1315. The plaintiff's allegations that non-African American employees were granted advance sick leave and not charged with leave for arriving late to work are based entirely on the plaintiff's subjective observations, and the plaintiff has submitted no documentary evidence of any kind to support her contention. *See* Pl.'s Opp'n Ex. 3 at 92:19–93:1 (plaintiff alleging in deposition that "there were others that were being advanced leave or there were [sic] speculation that others were being advanced leave" who were not African-Americans); *id.* at 93:2-3 (plaintiff noting in deposition that she "didn't go to the non-African Americans to say are you getting advanced leave") *id.* at 93:18-24 (plaintiff admitting in deposition that she obtained information regarding advance sick leave "secondhand" and not "from the source"). Indeed, the plaintiff is unable to name a single other employee, of any race or national origin, who had their advance leave request denied while they had a similar negative leave balance to the plaintiff. *See id.* at 95:5-17. Consequently, at the summary judgment stage, the plaintiff has failed to provide any admissible

---

[25] The defendant also asserts that this claim was not administratively exhausted. *See* Def.'s Mem. at 7–10; Def.'s Reply at 2–5. Since administrative exhaustion is not jurisdictional for Title VII claims, *see supra* Part II.E, the Court need not address this contention in light of its finding that the plaintiff has failed to put forward an issue of material fact such that a reasonable jury could find that she was subjected to a hostile work environment.

42

evidence that denial of advance sick leave was more prevalent for African-Americans than non-African-Americans and, therefore, cannot form the basis of a hostile work environment claim.

c)      *Charging Plaintiff Leave For Late Arrival*

As for charging the plaintiff with leave for arriving late to work, the plaintiff names three non-African American employees who allegedly told her that they were not subject to the same policy, Pl.'s Opp'n Ex. 3 at 102:1-15, but does not state whether these three employees were similarly situated to her in that they were working under a counseling memorandum regarding abuse of leave privileges, *see id.*  Moreover, she admits that she did not speak to all of her co-workers regarding the charging of leave for late arrival and that she spoke to no African-American co-workers regarding the practice.  *Id.* at 102:5-11.  The plaintiff also states that this requirement ended by 2008 after her return from carpal tunnel release surgery on her right hand. *Id.* at 110:7–111:13.  Thus, for the same reasons her discriminatory work assignment allegations and denial of advance sick leave allegations fail, so must her differential treatment allegation regarding the charging of leave for tardiness.

d)      *The Alleged Assault*

The plaintiff offers no evidence that the August 14, 2007 "bumping" incident between her and Mongelli was racially motivated.  The Federal Protective Service determined that "there was never an assault" during the incident.  Def.'s Mot. Ex. 42 at 6.  The plaintiff did not suffer any physical injury as a result of the bumping, Pl.'s Opp'n Ex. 36 at 79:11-12, and did not seek medical attention, *see id.* at 79:19-20 (plaintiff stating in deposition she proceeded to EEO office after bumping incident).  The plaintiff also offers no explanation as to how this bumping incident could have "altered the conditions of [her] employment," *Baloch*, 550 F.3d at 1201 to support a hostile work environment claim.

*      *      *

43

The plaintiff is correct that hostile work environment claims must be examined in light of the totality of the circumstances, Pl.'s Opp'n Mem. at 28, but the plaintiff has failed to provide admissible evidence of any discriminatory actions as support for her allegations.  Absent some admissible evidence that her allegations had a racially motivated component—or, in the case of the disparate treatment allegations, that the disparate treatment actually occurred—the plaintiff has failed to present any evidence from which a reasonable jury could infer that she was subjected to a hostile work environment on the basis of her race.  In analogous factual circumstances, where a plaintiff failed to show that any "of the comments or actions directed at [the plaintiff] expressly focused on his race," the D.C. Circuit upheld the District Court's finding that general "workplace conflicts" that were "sporadic [in] nature" and did not result in "tangible workplace consequences" could not support a hostile work environment claim on summary judgment.  *Baloch*, 550 F.3d at 1201; *see also Barbour v. Browner*, 181 F.3d 1342, 1348 (D.C. Cir. 1999) (holding that "intentionally slow response to one of [the plaintiff's] requests for information" and an employee's public and intentional snubbing of the plaintiff at a meeting were insufficiently "severe or pervasive to alter the conditions of [] employment") (citing *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1366 (10th Cir. 1997) for proposition that "five mild incidents of harassment over 16 month period did not create hostile working environment).  Consequently, the defendant's motion for summary judgment is granted as to Count I.

### 2.      *Count III "Retaliation" (Under Title VII)*

The plaintiff submits most of the same incidents underlying her racial discrimination claim as evidence of retaliation against the plaintiff for filing an unrelated EEO complaint in 2005, Compl. ¶ 262, as well as a vague claim that the defendant was "continuing to discriminate against her" after she filed her "most recent EEO complaint on or about August 7, 2007," *id.* ¶¶ 267–68.  Assuming that the plaintiff's EEO complaints are protected activity and that her

employer knew of them, the plaintiff has failed to allege that she suffered any "adverse employment action" within the meaning of Title VII, which is fatal to her retaliation claim.

An adverse employment action for Title VII retaliation purposes is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern,* 548 U.S. at 68 (internal quotation marks omitted).  In response to the Court's Order seeking clarification of her retaliation claims, the plaintiff refers to several incidents that reference her alleged disability exclusively, and are therefore irrelevant to her Title VII claim.  *See* Pl.'s Resp. at 3–5.  The plaintiff described the following conduct that was not exclusively related to her alleged disability: (1) Mongelli refused to provide "written instructions to clarify [the plaintiff's] responsibilities;" (2) Mongelli "made incorrect statements about Plaintiff's leave slips for August 8-9, 2007;" (3) Mongelli "harassed Plaintiff over her time and attendance" on October 9, 2009; (4) "the Agency harassed Plaintiff by looking through her computer hard drive at work, apparently to access documents that may relate to her EEO cases;" and (5) the bumping incident.  *Id.*

In the retaliation context, adverse actions are "not limited to discriminatory actions that affect the terms and conditions of employment," but reach any harm that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Baird,* 662 F.3d at 1249 (quoting *Burlington Northern,* 548 U.S. at 64, 68).  Nevertheless, "trivial harms," "petty slights," and "minor annoyances" do not rise to the level of adverse employment actions, even under the broader standard.  *Burlington Northern*, 548 U.S. at 68.

Although the plaintiff may have been upset by some of the incidents that occurred between 2007 and 2009, the standard for addressing adverse employment actions is an objective one and consideration of "unusual subjective feelings" is inappropriate to determine whether an

action was retaliatory in nature.  *Id.* at 68–69.  Under an objective standard, none of the plaintiff's allegations rise to the level of an adverse action.

The plaintiff's complaints that her supervisor did not provide written instructions and "made incorrect statements" about her leave slips amount to no more than the type of "petty slights" and "minor annoyances" that are rife in many employment settings.  *See id.* at 68. Mongelli requiring the plaintiff to be at her desk at the start of her shift and to alert a supervisor before leaving the building during her work day is a similarly "petty slight" when viewed objectively, despite the plaintiff's subjective feeling that "she felt singled out because of her EEO complaint."  *See* Pl.'s Resp. at 5.  The plaintiff has provided no evidence, beyond bare allegations in her own statements, that her hard drive was examined at any time, which is insufficient on summary judgment to allow a case to proceed to trial.  *Id.*  Finally, bumping into one's supervisor while leaving one's cubicle, when, due to the condition of the cubicle, "it would be difficult for the occupant to leave without touching the visitor regardless of intent," Inv. Rep. at 3, where no physical injury resulted, is, at worst, the kind of "trivial harm" that does not rise to the level of actionable retaliation under the *Burlington Northern* standard.

In short, the plaintiff has submitted no evidence that any of the alleged incidents could, when viewed objectively, be sufficient to dissuade a reasonable worker from filing an EEO complaint or otherwise exercising her rights under Title VII.  Since no reasonable juror could find that the plaintiff suffered an adverse employment action within the meaning of Title VII, the defendant's motion for summary judgment on Count III is granted.

*        *        *

While the plaintiff's allegations were sufficient to survive a motion to dismiss, at the summary judgment stage, the plaintiff must provide something more than her own self-serving

46

statements and uncorroborated allegations.  She has not done so.  Consequently, summary judgment must be granted to the defendant.

IV.     **CONCLUSION**

Since no reasonable jury could find that the plaintiff was disabled within the meaning of the Rehabilitation Act in effect prior to January 1, 2009, or that the plaintiff was subjected to a hostile work environment or retaliation based on her race, the defendant's motion for summary judgment is granted as to Counts II and IV as they pertain to pre-January 1, 2009 events and Counts I and III in their entirety.  To the extent that the plaintiff alleges discrimination and retaliation based on post-January 1, 2009 events pertaining to her alleged disability, the plaintiff has failed to show that she engaged in the requisite exhaustion of administrative remedies allowing this Court to exercise subject matter jurisdiction over those claims.  Consequently, to the extent that Counts II and IV refer to post-January 1, 2009 conduct, those counts are dismissed for lack of subject matter jurisdiction.

An Order consistent with this Memorandum Opinion will issue contemporaneously.

Date: May 13, 2015

_____
BERYL A. HOWELL
United States District Judge